REC'D JUN 10 2005

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINDA WADENSTEN, Individually and p.p.a. MAXIMUS WADENSTEN<br>Plaintiff, | : | |
| v. | : | C.A. NO. 04-326S |
| SOUTH COUNTY HOSPITAL;<br>PAMELA BURLINGAME, RNP;<br>ROBERT J. CASCI, JR., D.O.;<br>JOHN DOE, ALIAS; JANE DOE, ALIAS;<br>JOHN DOE CORPORATION, ALIAS<br>Defendants | : | |

**AMENDED REQUEST OF THE DEFENDANT SOUTH COUNTY HOSPITAL FOR ENTRY UPON LAND FOR INSPECTION PROPOUNDED TO PLAINTIFF LINDA WADENSTEN,INDIVIDUALLY AND p.p.a. MAXIMUS WADENSTEN, A MINOR**

Pursuant to Rule 34(a)(2) of the Federal Rules of Civil Procedure, defendant South County Hospital requests that plaintiff permit entry upon her land on June 20, 2005 for inspection of the premises and items specified below. Said Request for Inspection shall not be construed to limit or in any way affect plaintiffs' obligations under the compulsory discovery provisions of Rule 26(a)(1) of the Federal Rules of Civil Procedure.

**INSPECTION REQUESTS**

1. That portion of the premises of plaintiff's home at 48 Hannas Road, Charlestown, Rhode Island 02813, including the interior and exterior of all structures therein, where Maximus Wadensten was located, situated, or present on October 25, 2003 prior to his fall, at the time of his fall, subsequent to his fall, and at the time of his return from the Emergency Department at South County Hospital on that same date. This shall include an inspection of the locations where he was placed after his return from the Emergency Department on that date, the location within the home where he rested, napped or slept after his return from the

Emergency Department on that date, and the location where he was given a bath after his return from the Emergency Department, all as referenced by plaintiff's various pleadings, discovery responses, and the deposition testimony of Linda Wadensten and Jennifer Weiss.

2. Maximus Wadensten's stroller as identified in the medical record and the deposition testimony of Jennifer Weiss. *See Exhibits A and B attached hereto.* Defendant requests that the stroller be placed in the location where it was located when Jennifer Weiss removed Maximus Wadensten from the stroller on October 25, 2003. *See* Weiss Depo., p. 80-84 attached hereto as *Exhibit B*.

3. The flashlight specifically identified by Linda Wadensten in Answer No. 4 of Linda Wadensten, p.p.a. Maximus Wadensten, a Minor Answers to Interrogatories Propounded by the Defendant, South County Hospital.

4. The two dogs identified by Jennifer Weiss during her deposition. *See* Weiss Depo, p. 77-78 attached hereto as *Exhibit B*.

5. The dogs' crates as identified by Jennifer Weiss during her deposition. *See* Weiss Depo., p. 83-84 attached hereto as *Exhibit B*. Defendant requests that the crates be placed in the location where they were located on October 25, 2003.

DEFENDANT,
South County Hospital,

By Its Attorneys,
**RATCLIFFE BURKE HARTEN & ELIAS LLP**

Jay M. Elias, Esquire (#3050)
1600 Financial Plaza
Providence, RI 02903
401.331.3400
401.331.3440 [Fax]

**CERTIFICATION**

I hereby certify that a true copy of the within was hand-delivered on this 10th day of June 2005, to the following:

Amato A. DeLuca, Esquire
Miriam Weizenbaum, Esquire
DeLuca & Weizenbaum, Ltd.
199 North Main Street
Providence, RI 02903

Mark T. Nugent, Esquire
Paul V. Sullivan, Esquire
Morrison, Mahoney, LLP
121 South Main Street, Suite 600
Providence, RI 02903

Peggy Medeglia

*Amended Req. for entry upon land and inspection of premises.wpd*

© 1995-98 E.S.C. *Circle positives, check normals, backslash (\) negatives.*

16

# South County Hospital

## EMERGENCY PHYSICIAN RECORD

**Pediatric Injury** (5)

#000262891
WAGENSTEIN, MAXIMUS A
10/25/2003 ER
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
DOB 03/08/2003 M 7M
Wakensett, ROBERT J DO

TIME SEEN: 1600 ROOM: A4

HISTORIAN: __patient ✓family __paramedic __translator
Mom + nanny

**occurred:**
✓just PTA __EMS arrival
__today
__yesterday
__ days PTA

**location:**
✓home __school
__neighbor's __street / fwy
__work __park

**mechanism of injury:**
picking baby up out of stroller, dog bumped into nanny + baby was dropped 1-2 feet onto the floor, struck head + back

**pain/discomfort:**
(head) face neck
chest abdomen
back . *upper mid- lower*
*radiating to R / L thigh / leg*
R- shoulder UE hip LE
L- shoulder UE hip LE

***If contusion to head:***
***Immediate Cry?*** no (yes)

***loss of consciousness?***
(no) dazed yes

***decreased LOC since injury?***
(no) ~~yes~~

[redacted]

**PAST HISTORY** ✓negative __see nurses note

Meds- ✓none / see nurses note
Allergies- ✓NKDA
☑nurses note reviewed. ☑immunizations current. ☑vital signs noted.

## PHYSICAL EXAM

__IV __splint __back-board __c-collar ( PTA / in ED )

**GENERAL**
✓no acute distress __mild distress __moderate __severe
✓*active* __*playful* __fussy __crying __cries on exam

✓attentiveness normal (for age) __lethargic / weak cry
✓*smiles* ✓*good eye contact*
__*sleeping but easily arousable*

*INFANTS:*
__normal consolability __poor consolability

**HEAD** __Battle's Sign/Raccoon Eyes
__no evidence of trauma




**NECK**
✓non-tender __see diagram
✓painless ROM __vertebral point-tenderness
✓trachea & thyroid normal __muscle spasm / decreased ROM
__pain on movement of neck

**EYES**
✓PERRL __unequal pupils *R-*___*mm* *L-*___*mm*
✓EOMI __EOM entrapment/palsy
✓lids & conjunc. nml __subconjunctival hemorrhage
__pale conjunctivae
__foreign body
__hyphema
__corneal abrasion
__retinal detachment / papilledema

**ENT**
✓nml external inspection __hemotympanum
✓pharynx nml __nasal septal hematoma
__TM obscured by wax
__clotted nasal blood
__dental injury / malocclusion

**NEURO**
✓no apparent motor or sensory deficits __decreased responsiveness
__normal gait *(if applicable)* __facial asymmetry / EOM palsy / anisocoria
✓CN's nml as tested __paresis
__reflexes nml __sensory deficit
*ALSO SEE EYE EXAM*

T=Tenderness PT=Point Tenderness S=Swelling E=Ecchymosis
B=Burn C=Contusion L=Laceration A=Abrasion M=Muscle Spasm
PW=Puncture Wound (Ø=without ✓=mild ✓mod=moderate ✓✓=severe)
*Example: T✓✓ = Tenderness on palpation (severe)*

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

LINDA WADENSTEN, individually and p.p.a. Maximus Wadensten

VS. — C.A. NO. 04-0326 S

SOUTH COUNTY HOSPITAL; PAMELA BURLINGAME, RNP; ROBERT J. CASCI, JR., DO; TIMOTHY DRURY, MD; RHODE ISLAND EMERGENCY PHYSICIANS, INC.; JOHN DOE, Alias; JANE DOE, Alias; and JOHN DOE CORPORATION, Alias

* * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF JENNIFER WEISS, a Witness in the above-entitled cause, taken on behalf of the Defendants, Robert J. Casci, Jr., D.O., Timothy Drury, M.D., and Pamela Burlingame, RNP, before Cindy Ann Pannone, Notary Public in and for the State of Rhode Island, at the offices of Morrison Mahoney LLP, 121 South Main Street, Suite 600, Providence, Rhode Island, on May 26, 2005, at 10:00 A.M.

PRESENT:

FOR THE PLAINTIFF..........DeLUCA & WEIZENBAUM, LTD.
BY: MIRIAM WEIZENBAUM, ESQUIRE
- AND -
AMATO A. DeLUCA, ESQUIRE

FOR THE DEFENDANT..........RATCLIFFE, BURKE, HARTEN & ELIAS
(South County Hospital) BY: PAUL F. GALAMAGA, ESQUIRE

FOR THE DEFENDANTS.........MORRISON MAHONEY LLP
(Casci, Drury, Burlingame) BY: MARK T. NUGENT, ESQUIRE
- AND -
PAUL V. SULLIVAN, ESQUIRE

Also Present:
Rhonda Flemming, ProMutual Group
William White, videographer
Kerry Sheridan, videographer

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Page 74

house? Can you describe that?
A. You can pull the cart up backwards. I call it the cart, the three wheeler up back on the two wheels, and it goes up very easily up the stairs, and you pull him in the house and I brought him in.
Q. When you returned from your walk and you arrived back at the house in front of the landing, you didn't take Max out of the stroller, is that right?
A. No.
Q. He remained in the stroller?
A. Correct.
Q. You turned around backwards and lifted him in the stroller across the steps, is that correct?
THE WITNESS: Will you rephrase that? I'm confused.
Q. When you were lifting Max inside of the stroller up the steps, was Max behind you or was he in front of you?
MS. WEIZENBAUM: Objection, go ahead.
A. He was in front of me the same way I was going up the steps.
Q. Were you walking forward or walking backwards?
A. Backwards.
Q. So when you returned to the house and you were going into the house, you walked up three steps backwards,

Page 75

is that right?
A. Correct.
Q. Up onto the landing?
A. Correct.
Q. And you were holding onto the stroller, is that right?
A. Correct.
Q. And Max was in that stroller?
A. Correct.
Q. And he went up one, two, three up on top of the landing, is that correct?
A. Correct.
Q. You didn't lift up the entire stroller and carry him into the house, did you?
A. No.
Q. There was one more step to get in from the landing into the kitchen?
A. Correct.
Q. And you went through the door backwards?
A. Yes.
Q. When you went through backwards, you pulled the stroller behind you as you were walking backwards?
MS. WEIZENBAUM: Objection, go ahead.
Q. I will rephrase the question. If you were walking backwards, obviously he was in front of you, but you were moving backwards with the stroller, is that

Page 76

correct?
A. Correct.
Q. When you got him inside of the house -- strike that. What is the landing made out of?
A. It's not wood, it's like a new like pressed together particle.
Q. Composite material?
A. Exactly.
Q. Is it a decking?
A. It's a decking, yes.
Q. When you went up the stairs, are the stairs also made out of decking, a material?
A. Yes.
Q. They are not solid steps, in other words?
MS. WEIZENBAUM: Objection, go ahead.
A. I don't understand what you are saying.
Q. When you went up the steps, the top of the steps are made of the same decking material?
A. Correct.
Q. And in front of the steps, in between the two steps, here's a step, here's a step?
A. Um-hum.
Q. On the riser, is there any material riser or is there a space in between the steps?
A. I don't recall.

Page 77

Q. The landing itself was, as you described, more of a decking material?
A. Um-hum.
Q. Is that yes?
A. Yes.
Q. You went into the house, into the kitchen?
A. Correct.
Q. Closed the door?
A. Correct.
Q. What was the first thing you did after you closed the door?
A. I let the dogs smell the baby.
Q. Which dog?
A. Dogs.
MS. WEIZENBAUM: Objection.
Q. Two of them?
A. Correct.
Q. Can you describe the two dogs?
A. One is a mutt Lab and one is a mutt retriever or Gold Retriever.
Q. One would be mostly a Golden Retriever, I am not asking about the lineage?
A. Right, right.
Q. I am saying, if you looked at the dog, it would look like a Golden Retriever type, is that correct?

Word Index

A. Correct.
Q. And the other dog would be, essentially, a Lab, is that right?
A. Correct.
Q. A chocolate Lab?
A. Black.
Q. A black Lab. Were they normal size in appearance?
MS. WEIZENBAUM: Objection.
Q. In your opinion?
MS. WEIZENBAUM: Objection, you can answer, if you can.
MS. WEIZENBAUM: I mean, what's normal to you may not be normal to him, but answer to the best of your ability.
Q. Strike the question. Is there anything unusual about these two dogs that you want to tell us that you know about?
MS. WEIZENBAUM: Objection.
A. No.
Q. To your knowledge these dogs were fairly normal Lab and retriever, is that correct?
MS. WEIZENBAUM: Objection.
Q. Is that right?
A. Yes.
Q. Where do the dogs normally stay during the day, in the



house or outside?
A. Depending on the weather.
Q. Well, do they have a place that they go outside, in other words, a doghouse or something that they stay in outside during the day most of the time, or do they stay in the house and go out when you let them out?
A. They stay in the house and you let them out. When they are in the house, they are in their crates.
Q. Do you take them for a walk?
A. Yes, I did.
Q. When you took Max for a walk around the lake, did you take them for a walk?
MS. WEIZENBAUM: Objection.
A. Yes, I did.
Q. How did you -- strike that. Were the dogs on leashes, or are they free running?
A. They are free running.
Q. The dogs accompanied you and Max for that 20-minute walk and then returned back to the house, is that correct?
A. Yes, they did.
Q. When you were in the house, the dogs came in with you and Max at the same time?
MS. WEIZENBAUM: Objection.
A. Yes, they did.



Q. What did you do after you entered the kitchen with Max in the stroller?
A. I backed the stroller up to the refrigerator.
Q. Across the room?
A. Yes, across.
MS. WEIZENBAUM: Objection. Before we go on, I just want to state the basis for my objection so you are not surprised by anything. I am objecting to you leading the witness. She is not an opposing witness. She's not --
MR. NUGENT: You represent her, right?
MS. WEIZENBAUM: That's true, but that doesn't make her -- obviously, that's, you know, your decision as to whether you want to, you know, take that risk that I'm right and you're wrong, but my objection is to you leading the witness. So I wanted to make sure that you understand that as my objection as it will be asserted later, as, obviously, as necessary. So go ahead. It's just the lawyers thing. Don't worry about it.
MR. NUGENT: What was the last question.
(LAST QUESTION READ)
Q. When you backed the stroller up to the refrigerator, why did you do that?
A. I backed it up to the refrigerator to make sure it



wasn't going to go anywhere and that way the dogs weren't behind it for any reason and --
Q. Did you do that --
MR. DeLUCA: Were you finished?
Q. Go ahead, finish your answer.
A. And then I put the brake on.
MR. DeLUCA: Could I have that read back?
(PREVIOUS ANSWER READ)
Q. Where were the brakes on that stroller?
A. They are on the back two wheels.
Q. Are you fairly certain that you put the brakes on on the stroller?
A. Yes.
MS. WEIZENBAUM: Objection.
Q. Do you recall ever telling anybody that you did not put the brakes on that stroller that day?
A. No.
Q. Is there some reason why you put this stroller against the refrigerator as opposed to anywhere else in the room?
A. It's what I always did, because there's a little -- see how it sticks out like that, you can just put it right up against it (witness indicating).
Q. With the stroller in the corner next to the

refrigerator, is there a corner there?
A. Yes, there is like a little alcove, kind of like that (witness indicating).
Q. And it's your testimony that with the stroller over in that alcove area, you put brakes on the stroller, too?
A. Yes.
Q. What did you do next?
A. As I said, I let the dogs smell the baby.
Q. What's next?
A. I unbuckled him, I went to go take him out, and I went to go take him out like that (witness indicating) and --
MS. WEIZENBAUM: go ahead.
A. And I went to go turn --
THE WITNESS: Should I get up and do the whole?
MS. WEIZENBAUM: Why don't you go ahead and answer the question and then.
A. And when I went to go take him out, the dog hit my leg, I fell forward, Max hit his rear end, I dropped Max, he hit his rear end, and he hit his head.
Q. You stated earlier that Max had at least one blanket around him in addition to a sweatshirt, is that correct?
A. Correct.



Q. Did he still have a blanket on when he was in the alcove near the refrigerator?
A. No.
Q. When did you take that off?
A. When I, before I got ready to take him out.
Q. Can you describe step by step or layer by layer as you got to the corner before he was removed from the stroller what you did?
THE WITNESS: Repeat that.
Q. All right. Did you take the blanket off before you attempted to lift him out?
A. Yes.
Q. Did you unbuckle his belt?
A. Yes.
Q. Did you do anything else to remove anything from the stroller, or did you just pick him up from there?
A. I removed the other blanket because I had to unbuckle him and removed him.
Q. When you picked up Max from the stroller, did he have his sweatshirt on?
A. Still, yes.
Q. Did he still have the hood on?
A. No, I pulled that off.
Q. Where were the dogs at this time when you were taking the blankets off and unbuckling him?



A. They were in their crates.
Q. The dogs were?
A. When I was unbuckling him, when he was crying, yeah, I told them to go in their crates because they were, as I said, he was crying, and I let them sniff.
Q. Where were the crates?
A. In this room over here (witness indicating).
Q. In a different room?
A. Yes.
Q. The dogs left the room?
A. Um-hum.
Q. You told them to go to the crates, is that your testimony?
A. Correct.
Q. And they did what you told them?
A. Correct.
Q. And you attended to Max, is that right?
A. And I took all of his stuff off.
Q. His sweatshirt was still on?
A. His sweatshirt was still on.
Q. What did he have on his legs?
A. He had his Onesy, it's not a Onesy, it's just --
Q. Overalls?
A. Well, it's a Onesy, but it's a thick sweatshirt Onesy thing, you know.



Q. And he had a diaper on?
A. Correct.
Q. When you went to take him out of the stroller, did you bend your back?
A. I was bending my knees more than.
Q. Did you bend it at the waist?
A. Yes.
Q. So you bent at the waist forward, is that right?
A. Correct.
Q. Did you bend your knees?
A. Yes.
Q. Did you -- strike that. Can you describe how you reached for Max inside of the stroller?
THE WITNESS: Describe or show?
MR. NUGENT: Describe first, and then I will ask you to show when we get the video camera.
A. I reached in, I mean, with both hands.
Q. How did you hold Max with your hands?
A. Up under his armpits.
Q. Did he smell at that time?
A. Yes.
Q. Were you holding him in both hands?
A. Yes.
Q. How would you describe the positioning of your arms when you lifted him out of the stroller?