Q. Was there some feeling at that time that the examination was inappropriate in some way?
MS. WEIZENBAUM: Objection, go ahead.
A. We were just surprised that it was so quick.
Q. When you and Linda talked about, I believe you said, not having seen an eye examination, was there any discussion of calling the hospital and asking the hospital about that?
A. No, because we, again, had gone to the professionals, they sent us home with a piece of paper saying, you know, everything was fine.
Q. Well, the piece of paper didn't say everything was fine, did it?
A. They released us from the hospital telling us that everything was okay and to watch for these side effects and if it did happen, bring him back and that's exactly what we did.
Q. Do you have Exhibit C, and I am looking specifically at Page 2 of Exhibit C, which has Page 3 of 3 up in the corner?
A. Yes.
Q. Do you see the first line under head injury?
A. Yes.
Q. It says, "You have had a head injury which does not appear serious at this time," correct?



A. Correct.
Q. Then the next sentence, "Sometimes symptoms may appear later which could be a sign of a more serious problem (bruising or bleeding in the brain)." Did I read that correctly?
A. Yes.
Q. And you read that while you were at the house after the first visit, correct?
A. Yes.
Q. So you understood at that time that there had been a determination made at South County Hospital that they didn't believe there was a serious problem, that you were to look for signs that could indicate a problem such as bleeding in the brain, correct?
A. They didn't specifically say that but reading this, yeah.
Q. They didn't specifically say that, their document specifically says that, correct?
A. Correct.
MS. WEIZENBAUM: I object to the question.
Q. In looking further down on this document where it says, "return promptly," do you see that section?
A. Correct, yes, I do.
Q. It says, "Return promptly or contact your doctor if



any of the following occur," did I read that correctly?
A. Yes, you did.
Q. One of the reasons to return promptly or contact your doctor is "unusual drowsiness or unable to awaken as usual." Would you classify Maximus as having unusual drowsiness or unable to awaken as usual?
A. Unusual drowsiness, no, because he had missed his nap, which we discussed and unable to awaken as usual, he was very difficult to awake, as I had just said earlier, that he was waking up; but as I found out after we went back the second time, he was having a seizure. So to me that wasn't out of the ordinary for him.
Q. Okay. When you called Linda, why did you call her? After -- strike that. I am talking about after Linda was home, and she went back to the restaurant, you called Linda, right?
A. After the tub incident.
Q. Why did you call her?
A. Because he was unusual in the tub.
Q. Do you think he was -- you were unable to awaken as usual?
A. Right, and that was a symptom, so I called her, and we returned to the hospital.



Q. You didn't return to the hospital right away, right, you waited for Linda to drive home, correct?
MS. WEIZENBAUM: Objection, you can answer.
A. Correct.
Q. And you had already read this document, correct?
A. Correct.
Q. Did you say to Linda, gee, the document says I should return promptly to the hospital, you know, why can't you just meet me there?
MS. WEIZENBAUM: Objection, go ahead.
A. Correct. I mean, no, I didn't say that to her, but we did return, as -- not as prompt as that, but we did return.
Q. And you are not able to tell us today exactly how long it took Linda to get home, you would just be estimating based upon what you think the normal time to drive is?
A. Right.
Q. Then you would expect her to try and drive quicker?
A. Right.
Q. Now, you testified earlier about seeing the nurse practitioner examine the ears, correct?
A. Yes.
Q. Did you see the nurse practitioner examine the throat?

Page 242

A. No, I did not.
Q. Is it fair to say you don't know one way or the other if she examined the throat?
A. Correct.
Q. Would it be fair to say you don't know one way or the other if she examined the back?
THE WITNESS: His back?
MR. GALAMAGA: Yes.
A. I didn't observe that, no, I wouldn't know one way or the other.
Q. And you understand the distinction I want to make between things you say I know she didn't do and things that you are not sure one way or the other she did, do you understand that distinction?
A. Yes.
Q. Would it be fair -- strike that. Do you know if she examined the chest, the nurse practitioner?
A. She did examine the chest, yes.
Q. Did she listen to Maximus' heart?
A. Yes, with a stethoscope.
Q. Did you see her examine his arms, Maximus' arms?
A. I didn't observe that, no; I don't know one way or the other.
Q. Do you know if the nurse practitioner examined the legs?

Page 243

A. I don't know one way or the other.
Q. Do you know if the nurse practitioner examined the hips?
A. One way or the other, no.
Q. Do you know if the nurse practitioner examined Maximus's genital area?
A. I never saw her do that, no.
Q. Are you telling me that you don't think she did?
A. No, she did not.
Q. Did the nurse practitioner seem kind, caring, and compassionate during the visit, if you know, if you have an opinion on her?
THE WITNESS: Well, you want my opinion?
MR. GALAMAGA: I want what you think. All you can tell me is what you think.
A. I mean, when she kept saying her kids get bigger bumps than that, to me she was very condescending about that.
Q. You have seen people with bigger bumps than that that didn't ultimately have that type of injury?
MS. WEIZENBAUM: Objection. You mean any person?
MR. GALAMAGA: Right, any person.
A. But I wouldn't say that to someone when they are bringing, you know, their loved one into a hospital,

Page 244

if I was a nurse, "Oh, my kids have had bigger bumps than that, don't worry about that." It's certainly not the appropriate time or place.
Q. You don't know if she was trying to --
A. Again, it's just not an appropriate place to do that.
Q. You don't know if the nurse practitioner was just trying to allay any concerns by saying that?
MS. WEIZENBAUM: Objection.
A. I don't.
Q. Do you recall if the word surveillance was ever used by the nurse practitioner?
A. I don't recall.
Q. Do you recall if the nurse practitioner had discussed the need to look for any breathing abnormalities while Maximus was sleeping?
A. I don't recall that, no.
Q. Do you recall if the nurse practitioner discussed the fact that the nap shouldn't be longer than two hours?
A. She did say that, yes.
Q. Now, it's your testimony that certainly by the time you were in the car at South County Hospital from your first visit the baby was asleep, correct?
A. Yes.
Q. And he didn't wake up on the drive home, correct?

Page 245

A. Correct.
Q. And he didn't wake up when he was carried into the house, correct?
A. Correct.
Q. And he didn't wake up when he was put on the couch?
A. Correct.
Q. Is it your understanding that you tried to wake Maximus up within two hours of when he first fell asleep?
A. Is it my understanding that I did, yes, absolutely.
Q. What time would that have been when you first started trying to wake Maximus up?
A. 6:30.
Q. Maybe I am a little confused on something. What time did you call Linda on this when you were at home and the baby was sleeping and she went back to work, what time do you think you called Linda?
THE WITNESS: The tub incident time?
MS. WEIZENBAUM: Objection, asked and answered, you can answer it again.
A. It was probably, to the best of my knowledge, 10 of 7. I started to try to wake him up at 6:30. As I said, that was the time of starting his nightly regimen.