**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**LINDA WADENSTEN, Individually and :**
**p.p.a. MAXIMUS WADENSTEN :**
**:**
**v. : C.A. No. 04-326S**
**:**
**SOUTH COUNTY HOSPITAL; et al. :**

**PLAINTIFF'S REPLY TO DEFENDANT BURLINGAME'S OBJECTION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF NOTES**

## I. The Court ought to compel the production of Burlingame's notes.

Notwithstanding the fact that defendant Burlingame has the burden of proving the validity of her work-product and attorney-client assertions,[1] she does not cite a single authority in support of her non-disclosure position and—turning the burden of proof upside down—argues that the "*plaintiff* should be required to assert some facts as a good-faith basis to question [her] claim of privilege." Obj. at 2 (emphasis added). Not only does Burlingame erroneously seek to shift the burden of proof to plaintiff, she utterly ignores plaintiff's several citations to defendant's deposition, which show that her reliance on the work-product doctrine and attorney-client privilege to shield the subject notes from disclosure is clearly misplaced.

Defendant Burlingame's objection similarly ignores the fact that her work-product and privilege assertions are undermined completely by the Court's recent ruling on the nearly identical objection of Jennifer Weiss to defendant's motion to compel the production of the notes that Ms. Weiss wrote the day after Max suffered permanent neurological injuries and other damages as a proximate result of Burlingame's negligence. Indeed, within the last

[1] It is axiomatic that the party asserting the work-product doctrine or attorney-client privilege has the burden of proving that the subject documents are protected from disclosure. *See, e.g., United States v. Saccoccia,* 898 F. Supp. 53, 58 (D.R.I. 1995).

week, in accordance with the Court's Order of July 28, 2005 (copy attached), plaintiff produced to counsel for Burlingame a set of handwritten notes created by Maximus's nanny, Jennifer Weiss, on the day after Max fell to the floor, hit his head, was briefly examined by Burlingame in the emergency department at South County Hospital, and discharged in spite of the fact that he had an intracranial bleed that required immediate treatment.

As Burlingame does now, counsel for plaintiff and Ms. Weiss, claimed that Ms. Weiss's notes were protected from disclosure by the work-product doctrine and attorney-client privilege. In spite of a proffer that Ms. Weiss would testify that she created her notes in part because of the possibility of litigation, the Court found that Ms. Weiss "prepared the notes one day after the events that are the subject of this action," and that "the notes were not prepared at the direction of an attorney, or after consulting an attorney" and, further, that "the notes were not prepared in anticipation of litigation." Order at 2-3. Based thereon, the Court concluded that Ms. Weiss's notes must be produced to counsel for Burlingame because they were not protected from disclosure by either the attorney-client or the attorney work product privilege." *Id.* The Court's findings supporting the order compelling the production of the Weiss notes apply with equal force here.

The Weiss notes were prepared "*one day after the events that are the subject of this action.*" Similarly, Burlingame testified at her deposition that she prepared notes concerning her care and treatment of Maximus "on the night of the incident." Burlingame Dep. 5/20/05 at 9 (partial copy attached). Two days later, Burlingame made a second set of notes. *Id.*

The Weiss notes were not prepared "*at the direction of an attorney, or after consulting an attorney.*" Similarly, Burlingame was not represented by an attorney when she created the notes. She testified that *nobody* asked her to create the notes she wrote on the night of the

incident. Dep. at 9. Burlingame further testified that she created the second set of notes (two days later) at the request of the hospital's risk manager. *Id.* at 11.

The Weiss notes "*were not prepared in anticipation of litigation.*" Similarly, Burlingame testified that her notes on the night of the incident were "created for me by me" to remember the events of the day, anticipating that the matter may come under peer review. Dep. at 9-10. She testified that she created the second set of notes so that the hospital's risk manager would have a complete understanding of the discharge instructions. *Id.* at 11-12. While Burlingame testified that she contemplated peer review, joint commission review, and, "*possibly*," litigation when she wrote her day-of-incident notes, she emphasized that she created them "for [her] own recollection," "while it was fresh in [her] mind," and "*primarily*, for my own recollection to put down specifics that I didn't have an opportunity or space to document on the record." Dep. at 236-37. Burlingame explicitly stated that when she created the notes she considered litigation as only "one of the possible things that might have happened," but stressed that she "didn't specifically prepare" her notes out of concern for litigation. Dep. at 237. Plainly, Burlingame's notes were not created "in anticipation of litigation." *See, e.g.*, *In re Grand Jury Subpoena*, 220 F.R.D. 130, 148 (D. Mass. 2004)(litigation need not be imminent as long as the *primary motivating purpose* behind the creation of the document was to aid in possible future litigation).

Given Burlingame's deposition testimony, she cannot credibly maintain that her notes are protected from disclosure by either the work-product doctrine or the attorney-client privilege. Consistent with the order compelling the production of the Weiss notes, the Court ought to compel the production of Burlingame's notes.

Additionally, as plaintiff showed in her motion to compel, the Court ought to order the production of Burlingame's notes regardless of whether the asserted work-product

doctrine and attorney-client privilege claims have factual support (which they do not). Foremost, Burlingame reviewed and relied on her notes in answering her interrogatories (which answers she reviewed and relied on in preparing for her deposition).[2] Moreover, Burlingame effectively waived any protection afforded by the work-product doctrine and attorney-client privilege when she testified at deposition that everything in her notes was disclosed in her answers to interrogatories and deposition testimony. Dep. at 238. Shielding Burlingame's notes from discovery under privilege claims premised on non-disclosure when she asserts that their contents have been disclosed under oath in this case would unreasonably and unfairly preclude plaintiff from testing Burlingame's credibility and memory and determining what effect her review of the notes before signing her answers to interrogatories had on her deposition testimony and may have on her testimony at trial.

## II. The Court ought to compel the production of the medical texts.

There is no legal or factual basis whatsoever for Burlingame's objections to the production of medical texts and literature that she consulted after she discovered that she failed to diagnose Max's intracranial bleed. In essence, Burlingame testified at her deposition that she consulted the medical texts shortly after she failed to diagnose Max's intracranial bleed to confirm to herself that, in essence, she did nothing wrong.[3] Dep. at 20-21.

---

[2] *Cf., e.g., In re Joint Eastern and Southern District Asbestos Litigation*, 119 F.R.D. 4, 6 (E & S.D.N.Y. 1988)(disclosure of documents over work-product objection compelled where used to prepare crucial witness for deposition testimony; disclosure necessary to "test the credibility and memory of the witness and to determine what effect the document review had upon the witnesses' testimony").

[3] Defendant's claim that "any reference [by Burlingame] to [the medical literature] was either in anticipation of litigation or in conjunction with the preparation of her written discovery in this case" is misconceived. Burlingame testified that she consulted a pediatric life-support manual shortly after she treated Max "[t]o clarify in my mind what actually had become the final diagnosis in the emergency room *and to sort of see if there was anything that I might have done differently of wasn't aware of*." Dep. at 20 (emphasis added). She further testified that in so doing "I believed that I had done the appropriate physical exam, had looked for the appropriate signs and symptoms of severe head injuries. *I felt, after I read that information, that I hadn't missed anything* that was present at the time of the initial visit." *Id.* at 22 (emphasis added).

Incredibly, when plaintiff requested the production of these materials to test Burlingame's medical-text-exoneration claim, she objected, claiming that the texts are protected from disclosure by the work-product doctrine and attorney-client privilege.

"The attorney work-product privilege * * * protects from disclosure materials prepared by attorneys 'in anticipation of litigation.'" *Maine v. United States Dept. of Interior*, 298 F.3d 60, 66 (1st Cir. 2002). The medical texts that Burlingame seeks to protect from disclosure are plainly not "materials prepared by attorneys 'in anticipation of litigation," and therefore are not protected by the work-product doctrine. The attorney-client privilege protects confidential communications made by a client to an attorney. *See, e.g., In re Grand Jury Subpoena,* 274 F.3d 563, 571 (1st Cir. 2001). The medical texts that Burlingame seeks to protect from disclosure are clearly not "confidential communications made by a client to an attorney," and therefore are not protected by the attorney-client privilege.

## CONCLUSION

For the foregoing reasons and those stated in plaintiff's motion to compel, the Court ought to grant the plaintiff's motion and issue an order compelling defendant Burlingame to produce the requested documents within 5 days. Further, unless the Court is inclined to grant summarily plaintiff's motion to compel, plaintiff respectfully requests that the Court schedule a hearing at the earliest available date.

Plaintiffs,
By their attorneys,

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax

## CERTIFICATION

I hereby certify that I ~~mailed~~ hand delivered a true and accurate copy of the within to Jay Elias, Esq., Ratcliffe, Burke, Harten & Elias, LLP, 1600 Financial Plaza, Providence, RI 02903; Mark T. Nugent, Esq., Morrison, Mahoney, LLP, 121 South Main Street, Suite 600, Providence, RI 02903 on this 11th day of August 2005.

Jennifer Houston
______________________________

11 P 3:03

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

COPY

| | | |
|---|---|---|
| LINDA WADENSTEN | : | |
| | : | |
| v. | : | C.A. No. 04-326S |
| | : | |
| SOUTH COUNTY HOSPITAL, et al. | : | |

**ORDER**

Before the Court are several discovery motions which have been referred for determination. 28 U.S.C. §636(b)(1)(A); Local R. 32(b). A hearing was held on July 27, 2005. This Court's rulings made at the hearing are summarized below.

1. Prior to the July 27, 2005 hearing, the parties agreed to the resolution of South County Hospital's Motion to Compel More Responsive Answers to Interrogatories Propounded to Linda Wadensten, Individually (Document No. 166). The Court therefore DENIES, as moot, that Motion.

2. Prior to the July 27, 2005 hearing, the parties agreed to the resolution of the majority of South County Hospital's Motion to Compel More Responsive Answers and Strike Objections to Interrogatories Propounded to Linda Wadensten, P.P.A. Maximus Wadensten (Document No. 167). The parties were unable to agree, however, as to Interrogatory No. 6. After hearing argument, the Court DENIES South County Hospital's Motion, and finds Linda Wadensten's supplemental response to Interrogatory No. 6 to be sufficient.

3. The Court GRANTS South County Hospital's Motion to Compel Response at Deposition (Document No. 169) and will allow South County Hospital to reconvene the deposition of Jennifer Weiss for a period not to exceed three (3) hours. At such reconvened deposition, South County Hospital may inquire further of Ms. Weiss as to the October 25, 2003 dropping incident and may ask

her to demonstrate her actions which led up to, and resulted in, such incident. Defendants may use the balance of time to inquire as to any other discoverable matters not addressed at the first deposition of Ms. Weiss. The parties are directed to confer and determine a mutually agreeable time and location for the reconvened deposition.

4. The Court GRANTS South County Hospital's Motion for Physical and Mental Examination of Maximus Wadensten (Document No. 171), without prejudice to Plaintiff filing a motion for protective order if necessary and appropriate. South County Hospital shall promptly provide Plaintiff with a detailed description specifying the "time, place, manner, conditions and scope of the examination[s] and the...persons by whom [they are] to be made." Fed. R. Civ. P. 35(a). After such description is produced, the parties are directed to confer regarding the parameters of the examinations. Further, the Court DENIES South County Hospital's request that Ms. Wadensten be compelled to provide information during Maximus' examination(s), but the Court advises Ms. Wadensten that she may voluntarily do so if she chooses, and notes that South County Hospital has indicated that it may use her failure to provide information as the basis to move to exclude certain of Plaintiff's expert evidence at trial.

5. The Court GRANTS Rhode Island Emergency Physician Inc.'s Motion to Strike Objections and Compel Production of Documents (Document No. 174). The Court finds that Jennifer Weiss is a material fact witness in this action, her notes were prepared one day after the events that are the subject of this action, and that the notes were not prepared at the direction of an attorney, or after consulting with an attorney. Further, the notes were not prepared in anticipation of litigation. Therefore, the notes are not protected from disclosure by either the attorney-client or

the attorney work product privilege. Plaintiff's counsel is directed to produce the notes to the Defendants' counsel within five (5) days, or to exercise Plaintiff's right under 28 U.S.C. §636(b)(1) to appeal this Order and request a stay of production from District Judge Smith pending resolution of the appeal.

6. The Court DENIES as moot South County Hospital's Motion for Protective Order as to Linda Wadensten's Rule 30(b)(6) deposition of the Rhode Island Department of Health (Document No. 157) in view of Plaintiff's "withdrawal and cancellation" of such deposition notice and subpoena. This denial is, however, without prejudice to South County Hospital filing a new motion setting forth facts which have arisen since this Motion for a Protective Order was originally filed and seeking further relief from the Court regarding the documents in issue.

LINCOLN D. ALMOND
United States Magistrate Judge
July 28, 2005

9

A. When they were given to my attorney at the beginning of the proceedings back when I was notified there was a case.
Q. Have you retained a copy of those notes?
A. Yes.
Q. Why is it that you retained a copy?
A. I have the original of the note that I wrote the night of the incident because it was my copy to begin with, it was created for me by me.
I actually don't believe I have a copy of the verbal discharge instructions I was asked to produce for the hospital. I didn't keep a copy of that.
Q. The ones that you created for you, was that just so you would remember the events of that day?
A. Yes.
Q. I take it from your answer, but tell me if I am putting this together wrong, nobody asked you to create that?
A. No.
Q. Was there any other reason that you wrote those notes other than to make sure you remembered?
A. Whenever there is an incident like this where there is a complication from a prior visit, especially a significant complication, at the very

10

least there is a peer review of the case and an internal investigation as far as the risk management point of view where a sentinel event like this is reviewed as a joint commission requirement.
So I knew that there was going to be additional information that was going to be needed by internal investigators, if not others.
Q. So you wrote it in anticipation of the matter coming under peer review?
A. Yes.
Q. The review of sentinel events, that as I understand it, falls under peer review, is that correct?
A. I don't believe so. I think that they are separate. Review of sentinel events is probably something that happens in the risk management department under the direction of the risk management.
Peer review, as far as my understanding, is something that is done by the medical staff director or the director of the department with the immediate supervisor of the person on the medical staff. So peer review is a separate thing.
Q. Do you know whether -- or did you participate in writing an incident report?
A. No.

11

Q. Did you ever read an incident report?
A. Regarding this?
Q. Yes.
A. No.
Q. Is there any other reason that you took those notes other than what you've already told me? Maybe that is it. I just want to make sure that is complete.
A. No.
Q. With respect to the second notes that you took, I thought I heard you say that it was -- well, why don't you tell me again because I don't recall what you said as to why you took the second set of notes?
A. I was asked by the hospital risk manager to produce my recollection of the verbal discharge instructions that were given at the time of the discharge from the first visit.
Q. When were you asked to do that?
A. About two days after the event.
Q. What was your understanding as to why you were doing that, I mean, other than that the risk manager asked you, what is your understanding as to the purpose of that?
A. My belief was that they wanted to have a complete understanding of the written and the verbal instructions that were given to Linda Wadensten at

12

the time of discharge. That is the only other reason that I knew of.
Q. Did you work with anybody in writing that up?
A. No.
Q. Did you talk to anybody about what they recalled about the discharge instructions?
A. No.
Q. So what you wrote is solely your recollection?
A. Yes.
Q. Did you share it with anybody after it was written, other than giving it to risk management?
A. No.
Q. Did you ever discuss it with risk management or the risk manager after you gave it to her?
A. I don't believe so.
Q. Do you recall discussing with anybody else after you wrote up that recollection?
A. No.
Q. Did you discuss with anybody else the circumstances of this incident after the baby ultimately was transferred from the hospital, after he left South County Hospital, did you discuss the circumstances with anyone?
A. Yes, Dr. Casci.
Q. Anyone else?

A. No.
Q. Did you have the notes with you when you were drafting the answers to interrogatories?
MR. NUGENT: Objection.
A. They were at my home.
Q. But I mean, did you -- were you referring to them, did you look at them during the course of preparing your answers to interrogatories?
A. I believe I did.
Q. I take it, to refresh your recollection as to the incident?
A. Yes.
MR. GALAMAGA: Objection.
MR. NUGENT: Objection.
Q. What do you recall about your conversation with Dr. Casci?
MR. GALAMAGA: I am just going to object to the extent of the conversation was a part of the peer review process.
MS. WEIZENBAUM: That hasn't been established so --
MR. GALAMAGA: It hasn't been established one way or the other.
Q. Well, let me ask you this; when you spoke with either Dr. Casci or Dr. Drury, did you understand



yourself to be at a committee meeting?
A. No.
Q. I take it from your earlier answers, but just so we are clear, you didn't understand it to be a formal meeting of any kind, correct?
A. That is correct.
Q. So tell me about your conversation with Dr. Casci?
MR. GALAMAGA: Same objection.
A. The evening of the incident, we spoke about most of the events from the time that I initially saw the child until he became involved in the case and then, through his involvement in the case, and then the followup afterwards from the police department and from the Department of Children & Families, the fact that we had spoken to, one of us, I am not sure specifically which people spoke to who, but who made notifications, but that those things had been done and there were just some circumstances regarding the case that we talked about.
Q. Notifications to whom?
A. To specifically the Department of Children & Families, I believe Dr. Casci made that notification.
Q. Okay, we will get back to that. Did you speak with



anybody outside of the hospital concerning this incident, other than your attorneys?
A. No.
Q. So I asked you a little bit ago what you had reviewed in preparation for today's deposition; and you said you reviewed your answers to interrogatories and your professional resume, is that right?
A. Yes.
Q. Anything else?
A. No.
Q. Since the time of this incident, have you reviewed any medical literature that in any way pertains -- that you understand to pertain to this baby's presentation and outcome?
MR. NUGENT: Objection.
A. At what time? Immediately after or any time since then?
Q. At any time since then.
A. Yes, I reviewed some materials that I considered relevant to my knowledge base of the particular kind of injury that occurred and the outcome.
Q. Let me first start with what material you reviewed in that regard?



A. Specifically I looked at a pediatric advanced life-support provider manual.
Q. Anything else?
A. I looked at a review textbook for the certification in emergency nursing.
Q. Anything else?
A. That is the only ones that I can recall.
Q. So you didn't do a medical literature search, or anything in that regard?
A. No.
Q. These two items that you looked at, were those things that you retrieved yourself or are they things somebody gave to you?
A. Those are things I retrieved myself.
Q. With respect to the pediatric advanced life-support manual, what in that was relevant to you with respect to this incident?
MR. GALAMAGA: Objection.
MR. NUGENT: Objection to the form as well.
A. I was looking to refresh my memory of what actually is defined as different kinds of head injuries.
Q. Why did you look to that manual to look for definitions of kinds of head injury?
A. To clarify my mind what actually had become the

Document 223 Filed 08/05/2005 Page 12 of 14



final diagnosis in the emergency room and to sort of see if there was anything that I might have done differently or wasn't aware of.

**Q.** When you say you wanted to refresh your memory as to different kinds of head injury, what do you mean by different kinds of head injury?

MR. GALAMAGA: Objection.

**A.** There is a full spectrum of injuries to the head that can include very minor head injuries all the way to penetrating head injuries, and different kinds of bleeding in the head and how those are defined and what specific symptoms and signs accompany them.

**Q.** What was your understanding -- you said you wanted to clarify the final diagnosis in the emergency department. What was your understanding of the final diagnosis?

MR. NUGENT: Objection.

MR. GALAMAGA: Objection.

**A.** I believe that the final diagnosis was an epidural hematoma.

**Q.** What did you learn when looking at that book as far as -- well, strike that. When you looked at that book, did you see anything that was of any significance to this baby's presentation and your care?



MR. GALAMAGA: Objection.

MR. NUGENT: Objection.

**A.** Based on my review of that information, I believed that I had done the appropriate physical exam, had looked for the appropriate signs and symptoms of severe head injuries.

I felt, after I read that information, that I hadn't missed anything that was present at the time of the initial visit.

**Q.** What did you read in that manual that you found relevant to this conclusion that you drew?

MR. NUGENT: Objection.

**A.** I don't understand what conclusion I drew.

**Q.** Well, you drew the conclusion that you believed you'd done everything appropriate; you looked for the appropriate signs and symptoms, etc., as you just indicated. What did you read in this manual that led you to that conclusion?

MR. GALAMAGA: Objection.

**A.** I felt that it confirmed my belief that there was no evidence of intracranial bleeding at the time of the initial visit.

**Q.** What did you read in this book that led you to that conclusion?



MR. GALAMAGA: Objection.

MR. NUGENT: Objection.

**A.** The same things that I looked for during the physical exam of the child; change in mental status, abnormal pupillary configuration, evidence of bleeding in the eye, behind the ear -- behind the eardrum -- excuse me -- bruising at the base of the skull, behind the ears. Any abnormalities in the respiratory rate or observable circulatory functions.

**Q.** Anything else?

**A.** No.

**Q.** So if I understand you correctly, this manual sets forth those signs and symptoms that, if they are present, may indicate intracranial bleeding?

**A.** Yes.

**Q.** And it is your understanding that these signs and symptoms are the signs and symptoms that should be looked for in a baby who presents with head injury?

**A.** Yes.

MR. NUGENT: Objection.

**Q.** After looking at this book, you decided that you had done everything that was indicated on the list in this book?

MR. NUGENT: Objection.



MR. GALAMAGA: Objection.

**A.** Not necessarily. I looked at that information to reaffirm in my own mind the signs and symptoms that I would have been looking for, would have seen, if that injury had been detectable or present at the time of the first visit.

**Q.** Do you recall whether, in this manual, there was any indication as to the age range that it was covering?

MR. NUGENT: Objection.

**A.** I don't believe there is any specific age range; it is for all pediatrics.

**Q.** Do you recall whether there was anything in this manual that indicated the circumstances under which diagnostic imaging should be performed?

MR. NUGENT: Objection.

**A.** It is not that kind of manual.

**Q.** It is more of emergency care manual, right?

**A.** Yes.

**Q.** Sort of, like, acute emergency care even for EMTs?

**A.** It covers everything. It is not specifically for nurse practitioners or nurses. It is for anyone involved in emergency care.

**Q.** So it is the manual that, if you are an EMT and you are going to be transporting children, this is a manual that you would read?

you -- I mean, the scope of trauma is for minor trauma to major trauma. Do they see kids there that fall down and break arms or fingers, yes, they did see patients like that there.
Q. How long was that rotation?
A. One semester.
Q. That was a primary care facility, pediatric primary care?
A. Yes.
Q. Since you've become a nurse practitioner at South County Hospital, have you gone to any seminars or other programs that talk about the scope of privileges for a nurse practitioner, what a nurse practitioner can and can't do?
A. Not specifically in those terms. The seminars that I have attended have been primarily geared toward expanding clinical expertise.
One of the courses that I attended, I mentioned earlier, was regarding interpretation of plain film X-rays. I went to a course on splinting extremities. I went to a course on specifically joint evaluations. I went to a course that was specifically designed to teach nurse practitioners to suture more advanced wounds.
So they are more geared toward expanding



your knowledge base and expanding your ability to provide other services.
Q. Were you splinting fractures before you went to that course?
A. Yes.
Q. Were you doing that on occasion without a doctor coming to look at the splint; in other words, without direct physician supervision?
A. In some circumstances, yes. Minor fractures.
MS. WEIZENBAUM: Why don't we go off the record.
VIDEOGRAPHER: The time is 5:20 p.m. Going off the record.
(Off the record)
VIDEOGRAPHER: The time is 5:28. We are back on the record.
MS. WEIZENBAUM: I have no further questions.

EXAMINATION

BY MR. GALAMAGA:
Q. Ms. Burlingame, my name is Paul Galamaga and I represent South County Hospital. I just have a few questions for you. The patient in this case, the patient's name is Maximus Wadensten, is that correct?



A. Yes.
Q. The presentation of this patient, to your understanding, was a patient who had a bump on his head?
A. Yes.
MS. WEIZENBAUM: I am going to object. Paul, you are not allowed to ask leading questions.
MR. GALAMAGA: Well, is that a question -- is there really any dispute that it was a patient with a bump on the head?
MS. WEIZENBAUM: I am just saying.
Q. In the year 2003, was it the practice of South County Hospital that patients presenting with a bump on the head could be treated by you as a nurse practitioner?
MS. WEIZENBAUM: Objection.
A. Yes.
Q. What was your diagnosis of Maximus before discharge?
A. Minor head injury.
Q. In the year 2003, was it the practice of South County Hospital that patients that were diagnosed with a minor head injury could be treated and discharged by you as a nurse practitioner?
MS. WEIZENBAUM: Objection.
A. Yes.



Q. Based upon your clinical judgment at the time you treated Maximus Wadensten, do you believe that you performed an appropriate examination that allowed you to treat -- manage, treat and discharge the patient?
MS. WEIZENBAUM: Objection.
A. I believe so.
Q. You talked earlier about some notes you had prepared; do you recall that?
A. Yes.
Q. And those were notes, I think, that were identified in your answers to interrogatories?
A. The supplemental answers, yes.
Q. I believe earlier you said that you prepared those, if I recall correctly, you prepared those for the purpose of peer review?
MS. WEIZENBAUM: Objection.
A. There were two different documents produced. The one that I produced the day of the incident was produced for my own recollection, to put it down while it was fresh in my mind in case of peer review, joint commission review, ultimately in case there was a litigation involved; but, primarily, for my own recollection to put down specifics that I didn't have an opportunity or space to document on

the record.

Q. So one of the reasons you prepared those notes was a concern about litigation?

MS. WEIZENBAUM: Objection.

A. Possibly.

Q. When you say possibly --

A. That was one of the possible things that might have happened. I didn't specifically prepare the document to submit in that case.

MR. GALAMAGA: I have no further questions. Thank you.

MR. NUGENT: I have no questions.

FURTHER EXAMINATION

BY MS. WEIZENBAUM:

Q. Ms. Burlingame, what are on your notes that are not contained in the medical record?

A. Detail about when he -- well, not necessarily when he came in, but more detail about the physical exam, specifically more detail about the conversations that I had, the information that was given to me regarding the history and the mechanism; more detail regarding the discharge process and the discharge instructions that were given.

That was further detailed in the specific document that I was asked to produce with the verbal



discharge instructions on it.

Q. Did you recite the information that you recorded in that note in your answers to interrogatories?

A. To some degree, yes.

Q. Is there anything that is contained in your note that you didn't include in either the record, the answers to interrogatories, the supplemental answers to interrogatories, or your testimony here today?

A. I don't believe so.

MS. WEIZENBAUM: I have no further questions.

VIDEOGRAPHER: The time is 5:33 p.m. Going off the record.

(Adjourned 5:33 p.m.)



C E R T I F I C A T I O N

IN RE: LINDA WADENSTEN, Individually and p.p.a. MAXIMUS WADENSTEN v. SOUTH COUNTY HOSPITAL; PAMELA BURLINGAME, RNP; ROBERT J. CASCI, JR., D.O.; TIMOTHY DRURY, M.D., RHODE ISLAND EMERGENCY PHYSICIANS, INC.; JOHN DOE, ALIAS; JANE DOE, ALIAS; JOHN DOE CORPORATION, ALIAS

DEPOSED: PAMELA BURLINGAME, RNP

I, Joanne Mercurio Fontaine, RPR, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of A DEFENDANT, PAMELA BURLINGAME, in the above cause, was taken before me at the office of DELUCA & WEIZENBAUM, LTD., 199 SOUTH MAIN STREET, PROVIDENCE, RI 02903 on MAY 20, 2005, at 10:00 a.m. That previous to examination of said witness, PAMELA BURLINGAME, was first duly sworn by me and duly cautioned to testify to the truth, whole truth, and nothing but the truth; and that SHE thereupon testified in the foregoing manner, as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer, and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court. Therefore, the original is delivered and retained by the PLAINTIFF'S counsel, MIRIAM WEIZENBAUM.

IN WITNESS WHEREOF, I have hereunto set my hand this 24TH day of MAY 2005.

Joanne Mercurio Fontaine

JOANNE MERCURIO FONTAINE, RPR
Notary Public