A. Yup.
Q. It is also important that you answer verbally. Responses like uh-huh and nodding and shaking will come across ambiguously on the record, so what you think you are conveying may not make it to the record -- to the stenographic record, so it is important to answer verbally. If you forget, I will remind you. Everybody does. Don't feel bad.
Also there will be times when you will anticipate the end of my question. It is important to allow me to finish my question so your answer is not mixed up with my question and it makes it clearly to the record. Okay?
A. Yup.
Q. I conversely will try to allow you to finish your answer before I pose another question, okay?
A. Yes.
Q. During the course of the deposition, we will cover different areas, and just because we moved from one area to the next doesn't mean, if you remember something, you need to change testimony, add something or to make it accurate, you can always go back and reference testimony you've given earlier.
A. Yes.
Q. So just because we've moved on from an area doesn't



mean you cannot make reference back to it and correct something or whatever you feel you need to make it accurate.
A. Okay.
Q. If anything in any way interferes with your ability to answer the questions fully and accurately, please let me know -- if we are waiting too long for lunch or whatever it may be, but just let me know, okay.
A. Okay.
(PLAINTIFF'S EXHIBITS NO. 2 AND 3 SO MARKED)
Q. Let me begin by asking you to look at what I marked as Plaintiff's Exhibit 2 and 3 which I will identify for the record as your answers to interrogatories and your first supplemental answers to interrogatories.
I am going to give these to you to look at and the question I will ask you is whether these answers to interrogatories are complete and accurate as of today, so take the time that you need to look at them. That is the question I will ask you to answer.
MR. NUGENT: Objection. Do you want to go off the record until she is done?
MS. WEIZENBAUM: No, it is okay.
Q. Did you take the time that you needed to review



those answers?
A. Yes.
Q. Are they accurate and complete as of today?
A. Yes.
MR. NUGENT: Objection.
Q. I guess, to put another way, is there anything you need to change or add to make them accurate and complete?
MR. NUGENT: Objection.
A. No.
Q. There are a few more general background things, then I will ask you more specific questions about your experience. Did you review anything in preparation for today's deposition?
A. I reviewed my copy of the original interrogatories, the supplemental answers to the interrogatories, and my professional resume.
Q. Anything else?
A. No.
Q. I notice from your supplemental answers that you've taken two sets of notes at different times after this incident. Did you review those in preparation for your deposition?
A. No.
Q. When did you last look at those?



A. When they were given to my attorney at the beginning of the proceedings back when I was notified there was a case.
Q. Have you retained a copy of those notes?
A. Yes.
Q. Why is it that you retained a copy?
A. I have the original of the note that I wrote the night of the incident because it was my copy to begin with, it was created for me by me.
I actually don't believe I have a copy of the verbal discharge instructions I was asked to produce for the hospital. I didn't keep a copy of that.
Q. The ones that you created for you, was that just so you would remember the events of that day?
A. Yes.
Q. I take it from your answer, but tell me if I am putting this together wrong, nobody asked you to create that?
A. No.
Q. Was there any other reason that you wrote those notes other than to make sure you remembered?
A. Whenever there is an incident like this where there is a complication from a prior visit, especially a significant complication, at the very

Page 10

least there is a peer review of the case and an internal investigation as far as the risk management point of view where a sentinel event like this is reviewed as a joint commission requirement.

So I knew that there was going to be additional information that was going to be needed by internal investigators, if not others.

Q. So you wrote it in anticipation of the matter coming under peer review?
A. Yes.
Q. The review of sentinel events, that as I understand it, falls under peer review, is that correct?
A. I don't believe so. I think that they are separate. Review of sentinel events is probably something that happens in the risk management department under the direction of the risk management.

Peer review, as far as my understanding, is something that is done by the medical staff director or the director of the department with the immediate supervisor of the person on the medical staff. So peer review is a separate thing.

Q. Do you know whether -- or did you participate in writing an incident report?
A. No.

Page 11

Q. Did you ever read an incident report?
A. Regarding this?
Q. Yes.
A. No.
Q. Is there any other reason that you took those notes other than what you've already told me? Maybe that is it. I just want to make sure that is complete.
A. No.
Q. With respect to the second notes that you took, I thought I heard you say that it was -- well, why don't you tell me again because I don't recall what you said as to why you took the second set of notes?
A. I was asked by the hospital risk manager to produce my recollection of the verbal discharge instructions that were given at the time of the discharge from the first visit.
Q. When were you asked to do that?
A. About two days after the event.
Q. What was your understanding as to why you were doing that, I mean, other than that the risk manager asked you, what is your understanding as to the purpose of that?
A. My belief was that they wanted to have a complete understanding of the written and the verbal instructions that were given to Linda Wadensten at

Page 12

the time of discharge. That is the only other reason that I knew of.
Q. Did you work with anybody in writing that up?
A. No.
Q. Did you talk to anybody about what they recalled about the discharge instructions?
A. No.
Q. So what you wrote is solely your recollection?
A. Yes.
Q. Did you share it with anybody after it was written, other than giving it to risk management?
A. No.
Q. Did you ever discuss it with risk management or the risk manager after you gave it to her?
A. I don't believe so.
Q. Do you recall discussing with anybody else after you wrote up that recollection?
A. No.
Q. Did you discuss with anybody else the circumstances of this incident after the baby ultimately was transferred from the hospital, after he left South County Hospital, did you discuss the circumstances with anyone?
A. Yes, Dr. Casci.
Q. Anyone else?

Page 13

A. There was a discussion with someone from the Charlestown Police Department. There was a discussion with several -- a few days later with someone from the Department of Children & Families.
Q. Anyone else from the hospital that you talked about this with in any context?
A. Dr. Drury.
Q. In what context did you -- when did you speak with Dr. Drury?
A. Within a few days. I don't recall specific dates or times.
Q. Were you discussing that informally or was that a set scheduled discussion?

MR. GALAMAGA: Objection.

A. No, it was informal.
Q. Was anybody else there when you spoke with Dr. Drury?
A. I believe not.
Q. You said you also spoke with -- is it Dr. Casci?
A. Casci.
Q. Was that a scheduled or informal discussion?

MR. GALAMAGA: Objection.

A. Informal.
Q. How long after the baby left -- I take it that was after the baby left for Hasbro, is that correct?

Page 234

your knowledge base and expanding your ability to provide other services.
Q. Were you splinting fractures before you went to that course?
A. Yes.
Q. Were you doing that on occasion without a doctor coming to look at the splint; in other words, without direct physician supervision?
A. In some circumstances, yes. Minor fractures.
MS. WEIZENBAUM: Why don't we go off the record.
VIDEOGRAPHER: The time is 5:20 p.m. Going off the record.
(Off the record)
VIDEOGRAPHER: The time is 5:28. We are back on the record.
MS. WEIZENBAUM: I have no further questions.

EXAMINATION

BY MR. GALAMAGA:
Q. Ms. Burlingame, my name is Paul Galamaga and I represent South County Hospital. I just have a few questions for you. The patient in this case, the patient's name is Maximus Wadensten, is that correct?

Page 235

A. Yes.
Q. The presentation of this patient, to your understanding, was a patient who had a bump on his head?
A. Yes.
MS. WEIZENBAUM: I am going to object. Paul, you are not allowed to ask leading questions.
MR. GALAMAGA: Well, is that a question -- is there really any dispute that it was a patient with a bump on the head?
MS. WEIZENBAUM: I am just saying.
Q. In the year 2003, was it the practice of South County Hospital that patients presenting with a bump on the head could be treated by you as a nurse practitioner?
MS. WEIZENBAUM: Objection.
A. Yes.
Q. What was your diagnosis of Maximus before discharge?
A. Minor head injury.
Q. In the year 2003, was it the practice of South County Hospital that patients that were diagnosed with a minor head injury could be treated and discharged by you as a nurse practitioner?
MS. WEIZENBAUM: Objection.
A. Yes.

Page 236

Q. Based upon your clinical judgment at the time you treated Maximus Wadensten, do you believe that you performed an appropriate examination that allowed you to treat -- manage, treat and discharge the patient?
MS. WEIZENBAUM: Objection.
A. I believe so.
Q. You talked earlier about some notes you had prepared; do you recall that?
A. Yes.
Q. And those were notes, I think, that were identified in your answers to interrogatories?
A. The supplemental answers, yes.
Q. I believe earlier you said that you prepared those, if I recall correctly, you prepared those for the purpose of peer review?
MS. WEIZENBAUM: Objection.
A. There were two different documents produced. The one that I produced the day of the incident was produced for my own recollection, to put it down while it was fresh in my mind in case of peer review, joint commission review, ultimately in case there was a litigation involved; but, primarily, for my own recollection to put down specifics that I didn't have an opportunity or space to document on

Page 237

the record.
Q. So one of the reasons you prepared those notes was a concern about litigation?
MS. WEIZENBAUM: Objection.
A. Possibly.
Q. When you say possibly --
A. That was one of the possible things that might have happened. I didn't specifically prepare the document to submit in that case.
MR. GALAMAGA: I have no further questions. Thank you.
MR. NUGENT: I have no questions.

FURTHER EXAMINATION

BY MS. WEIZENBAUM:
Q. Ms. Burlingame, what are on your notes that are not contained in the medical record?
A. Detail about when he -- well, not necessarily when he came in, but more detail about the physical exam, specifically more detail about the conversations that I had, the information that was given to me regarding the history and the mechanism; more detail regarding the discharge process and the discharge instructions that were given.
That was further detailed in the specific document that I was asked to produce with the verbal

discharge instructions on it.
Q. Did you recite the information that you recorded in that note in your answers to interrogatories?
A. To some degree, yes.
Q. Is there anything that is contained in your note that you didn't include in either the record, the answers to interrogatories, the supplemental answers to interrogatories, or your testimony here today?
A. I don't believe so.
MS. WEIZENBAUM: I have no further questions.
VIDEOGRAPHER: The time is 5:33 p.m. Going off the record.
(Adjourned 5:33 p.m.)



CERTIFICATION

IN RE: LINDA WADENSTEN, Individually and p.p.a. MAXIMUS WADENSTEN v. SOUTH COUNTY HOSPITAL; PAMELA BURLINGAME, RNP; ROBERT J. CASCI, JR., D.O.; TIMOTHY DRURY, M.D., RHODE ISLAND EMERGENCY PHYSICIANS, INC.; JOHN DOE, ALIAS; JANE DOE, ALIAS; JOHN DOE CORPORATION, ALIAS
DEPOSED: PAMELA BURLINGAME, RNP

I, Joanne Mercurio Fontaine, RPR, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of A DEFENDANT, PAMELA BURLINGAME, in the above cause, was taken before me at the office of DELUCA & WEIZENBAUM, LTD., 199 SOUTH MAIN STREET, PROVIDENCE, RI 02903 on MAY 20, 2005, at 10:00 a.m. That previous to examination of said witness, PAMELA BURLINGAME, was first duly sworn by me and duly cautioned to testify to the truth, whole truth, and nothing but the truth; and that SHE thereupon testified in the foregoing manner, as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer, and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court. Therefore, the original is delivered and retained by the PLAINTIFF'S counsel, MIRIAM WEIZENBAUM.

IN WITNESS WHEREOF, I have hereunto set my hand this 24TH day of MAY 2005.

JOANNE MERCURIO FONTAINE, RPR
Notary Public

A-1 Court Reporters (401)333-3381