**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **LINDA WADENSTEN, Individually and** | : | |
| **p.p.a. MAXIMUS WADENSTEN** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **C.A. NO. 04-326S** |
| | : | |
| **SOUTH COUNTY HOSPITAL;** | : | |
| **PAMELA BURLINGAME, RNP;** | : | |
| **TIMOTHY DRURY, M.D.;** | : | |
| **RHODE ISLAND EMERGENCY** | : | |
| **PHYSICIANS, INC.;** | : | |
| **JOHN DOE, ALIAS; JANE DOE, ALIAS;** | : | |
| **JOHN DOE CORPORATION, ALIAS** | : | |
| **Defendants** | : | |

**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**[EMTALA CLAIMS]**
**OF**
**DEFENDANT SOUTH COUNTY HOSPITAL**

Now comes defendant South County Hospital and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves this Honorable Court for entry of Summary Judgment in its favor as to all of the plaintiff's EMTALA claims brought against it.

Defendant South County Hospital submits the accompanying Memorandum of Law in further support of its motion.

Respectfully submitted by:
Defendant,
**South County Hospital**
By its Attorneys,
**RATCLIFFE BURKE HARTEN & ELIAS, LLP**

Jay M. Elias, Esquire (#3050)
Paul F. Galamaga, Esquire (#5803)
1600 Financial Plaza
Providence, RI 02903
401.331.3400
401.331.3440 [Fax]

**CERTIFICATION**

I hereby certify that a true copy of the within was mailed, postage prepaid, and sent via facsimile on this 7th day of April 2006, to the following:

Amato A. DeLuca, Esquire
Miriam Weizenbaum, Esquire
DeLuca & Weizenbaum, Ltd.
199 North Main Street
Providence, RI 02903

Mark T. Nugent, Esquire
Paul V. Sullivan, Esquire
Morrison, Mahoney, LLP
121 South Main Street, Suite 600
Providence, RI 02903

MotionforSummaryJudgment.04.04.06.doc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **LINDA WADENSTEN, Individually and** | : | |
| **p.p.a. MAXIMUS WADENSTEN** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **C.A. NO. 04-326S** |
| | : | |
| **SOUTH COUNTY HOSPITAL;** | : | |
| **PAMELA BURLINGAME, RNP;** | : | |
| **TIMOTHY DRURY, M.D.;** | : | |
| **RHODE ISLAND EMERGENCY** | : | |
| **PHYSICIANS, INC.;** | : | |
| **JOHN DOE, ALIAS; JANE DOE, ALIAS;** | : | |
| **JOHN DOE CORPORATION, ALIAS** | : | |
| **Defendants** | : | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF**
**DEFENDANT SOUTH COUNTY HOSPITAL'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT [EMTALA]**

Now comes defendant South County Hospital [hereinafter sometimes referred to as the "Hospital"] and respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment as to all of plaintiff Linda Wadensten's claims of EMTALA violations against the Hospital. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant South County Hospital submits there are no genuine issues of material fact as to those claims and, accordingly, the Hospital is entitled to judgment in its favor as a matter of law.

## Facts and Travel

The issues presented by this lawsuit concern care and treatment provided to the minor plaintiff, Maximus Wadensten at South County Hospital on October 25, 2003.

The parties to the lawsuit include the Hospital, Rhode Island Emergency Physicians, Inc. (a corporation which contracts with the South County Hospital for the provision of emergency medical services), Timothy Drury, M.D. (an employee and the President of Rhode Island Emergency Physicians, Inc.), and Pamela Burlingame, R.N.P, (also an employee of the same corporation). Robert J. Casci, Jr., D.O., another physician employed by the corporation, was named as a party defendant and subsequently voluntarily dismissed from the lawsuit.

Both Dr. Drury and Pamela Burlingame have been credentialed by and hold Medical Staff privileges at South County Hospital, enabling them to practice within the scope of their Rhode Island professional licenses.

The plaintiff is Linda Wadensten. She has brought this action individually and in her capacity as the natural and legal guardian of the minor child, Maximus [hereinafter sometimes referred to as "Max"] Wadensten. Max has a date of birth of March 8, 2003. He is the product of *in vitro* fertilization and, as such, there are no claims in behalf of his biological father. Max is the only child of Ms. Wadensten. The date of the incident alleged in plaintiff's Complaint is October 25, 2003, when Max was approximately seven months of age. It is claimed that Max suffers various neurological injuries as the result of a delay in the diagnosis of an epidural hematoma.

On or about August 6, 2004, Plaintiff filed this action in connection with care and treatment provided to Max at South County Hospital during two visits to the Hospital's emergency department

on October 25, 2003. Plaintiff filed her Amended Complaint on September 18, 2004, and filed a Second Amended Complaint on or about December 15, 2004. Plaintiff's claims against South County Hospital are set forth in her Second Amended Complaint and include the following: EMTALA - Failure to Provide Medical Screening (Count VII), EMTALA - Transfer Without Stabilization (Count VIII), Medical Negligence (Count IX), Lack of Informed Consent (Count X), Corporate Liability (Count XI), and Vicarious Liability (Count XII). "EMTALA" refers to the Emergency Medical Treatment and Active Labor Act, *42 U.S.C.S. § 1395dd et seq.*

Plaintiff's claims of EMTALA violations are the subject of this Motion for Summary Judgment.

Plaintiff brought this suit in the United States District Court for the District of Rhode Island based upon alleged federal question jurisdiction in light of her claims of EMTALA violations. The Hospital herein seeks the dismissal of all EMTALA claims. In essence, the basis for the Hospital's motion is the fact that EMTALA was never intended to, and should not now, serve as a federal medical malpractice statute. EMTALA was never intended to, and should not now, address specific allegations relating to standards of care or the exercise of professional medical or nursing judgment, as in the pending case.

The gravamen of plaintiffs' Complaint is alleged inadequacies in the medical care and treatment received by Max Wadensten at South County Hospital on October 25, 2003 following an incident in which his babysitter, Jennifer Weiss, dropped Max onto the kitchen floor. Ms. Weiss is not a party to the lawsuit, although the Hospital had sought leave of court to file a third party action against her based upon the fact that Ms. Weiss directly caused the minor plaintiff's injuries. She has admitted to having dropped Max after being bumped by the plaintiff's two dogs.

A chronology of the salient facts is as follows:

On October 23, 2005, Ms. Weiss had taken Max for a walk in his stroller. He had not had his morning or afternoon nap. They returned to Ms. Wadensten's house at approximately 3:30 p.m. Ms. Wadensten owns two large dogs, both of which were at home on the day of the incident. Each dog has its own crate which can be closed and are used for sleeping and as a place where the dogs can be kept. On that day, the dogs were not in their crates.

Ms. Weiss essentially described the dogs as being excited when Ms. Weiss and Max returned home from their stroll and entered the house. The babysitter testified that, rather than putting the dogs in their crates before taking Max out of his stroller, she instead placed the stroller face-first against the refrigerator, apparently as a means of steadying it while she took the child out. The height of the seat of the tricycle-style "jogging" stroller was approximately 12-18 inches off the floor.

According to Ms. Weiss, the dogs became more excited and agitated as she was taking Max out of his stroller and either jumped up or bumped into her. This is not a small woman; Ms. Weiss testified at deposition that at the time of the incident she weighed more than two hundred pounds. Ms. Weiss testified that instead of gripping Max more tightly, she chose to drop him to steady herself. Ms. Weiss reported that the child first fell onto his diapered buttocks, and then onto his head. She also reported that Max cried immediately and at no time did he lose consciousness.

Ms. Weiss then called Ms. Wadensten at the restaurant which Ms. Wadensten owns in North Kingstown, Rhode Island, and it was agreed that Ms. Weiss would take the child to South County

Hospital for evaluation; the boy's mother would meet them at the Hospital.

Max was evaluated by a triage nurse in the Hospital's emergency department at 3:44 p.m., and then seen by Pamela Burlingame, R.N.P. at 4:04 p.m. Nurse Practitioner Burlingame obtained a history of the incident from the babysitter and the child's mother, and was informed that the child was accidentally dropped by the babysitter from the low height of one to two feet onto the kitchen floor. As noted above, it was reported to Nurse Practitioner Burlingame by the mother and babysitter that the child landed first onto his buttocks and then rolled back, hitting his head. It was also reported to her that there was no loss of consciousness, no vomiting, and that the child cried immediately. It was also noted in the physical examination that the child was awake, alert, active, and in no acute distress. Max was described as smiling, with good eye contact, indicating attentiveness appropriate for his age.

Nurse Practitioner Burlingame performed a neurological examination of the child, which was determined to be normal. There were no findings suggestive of any neurological abnormality. Nurse Practitioner Burlingame also performed an overall assessment and evaluation of Max. Her physical examination included an examination in the child's ears, and she found no presence of *hemotympanum* (the presence of blood in the tympanic cavity of the middle ear). A "bump" on the right occipital region of the child's scalp was noted and illustrated in the record. Nurse Practitioner Burlingame's notes written next to the medical record diagram of the bump indicate that the finding was of a scalp contusion. She determined that no radiographic studies were needed.

A diagnosis of "minor head injury" was made by Nurse Practitioner Burlingame consistent with her assessment. Assured that the child's mother and babysitter would closely monitor the child, Nurse Practitioner Burlingame provided specific verbal and written instructions regarding the

observation of head injury, and determined that it was appropriate to allow the child to be taken home. Nurse Practitioner Burlingame believed that the mother and babysitter were competent caregivers available to watch the child closely at home, and she advised them of the fact that while the child's head injury did not appear serious at that time, it was possible that symptoms could develop later which could be a sign of a more serious problem, such as bruising or bleeding in the brain. The mother and the babysitter were advised of warning signs to watch for, including, but not limited to, repeated vomiting, severe or worsening headache or dizziness, unusual drowsiness, unequal pupils, an inability to awaken the child as usual, increasing scalp or face swelling or redness or warmth. Consistent with the Hospital's policy, Nurse Practitioner Burlingame signed the medical record, as did Dr. Drury.

Max was released from the emergency department at 4:18 p.m. Max, his mother, and Ms. Weiss then returned home, and Max was placed on a couch in the living room to rest. Max' mother then returned to her restaurant after approximately one hour. Ms. Weiss, the babysitter, reported that she frequently poked the child to elicit movement and responses. She then reported that at 6:30 p.m. she attempted to awaken the child for his dinner and bath. When she continued to be unable to awaken him, she placed Max in a bath, apparently to stimulate him, but with little response. She then called Ms. Wadensten at work about the change in condition. Rather than immediately bringing the child back to the Hospital, or calling emergency rescue personnel, Ms. Wadensten drove home to Charlestown from her restaurant in North Kingstown. She then checked the child's pupils, concluded that they were abnormal in appearance, and then drove to South County Hospital. It was reported that at some point during that time period Max was displaying some jerking movements.

The child arrived back at the Hospital at approximately 8:00 p.m., more than one and one-

half hours after the babysitter indicated she had trouble awakening Max. He was noted to be seizing upon arrival to the Hospital, and was immediately seen by Nurse Practitioner Burlingame and Dr. Robert Casci, placed on oxygen, administered various medication, including *Ativan* and *Dilantin* for his seizures and *Mannitol* to treat increased intracranial pressure. A CT scan of the brain revealed a right-sided epidural hematoma and the child was transported via helicopter to Hasbro Children's Hospital. It is alleged that Max now suffers a variety of deficits as the result of a delay in diagnosis and treatment of an epidural hematoma.

**Summary Judgment Standard**

*Fed.R.Civ.P. 56* provides that summary judgment may be entered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.56(c); see also Celotex Corp, v. Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc. 477 U.S. 242,248, 91 L. Ed. 2d 202, 106 S. Ct 2505 (1986).* Simply stated, the "principle judicial inquiry required by *Rule 56* is whether a genuine issue of material fact exists." Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2725, p. 401.

When a moving party asserts that the competent evidence clearly demonstrates that it is entitled to judgment and has satisfied this burden, then the onus shifts to the resisting party to show that there still exists "a trial worth issue as to come material fact". *Cortes-Irizarry v. Corporacion*

*Insular, 111 F. 3d 184, 187 (1st Cir. 1997).*

Summary judgment's role is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required". *McIntosh v. Antonio, et al., 71 F. 3d 29, 33 (1st Cir. 1995).*

While the moving party has the burden of initially establishing that there is an absence of evidence to support the nonmoving party's case, the non-movant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions", *Lawton v. State Mutual Life Assurance Company of America, 101 F. 3d 218, 223 (1st Cir. 1996),* or "posturing and conclusory rhetoric". *McIntosh, 71 F. 3d at 33.*

**Applicable Law and Analysis**

In the instant case, Linda Wadensten filed her lawsuit in the federal district court alleging both medical malpractice and violations of EMTALA. Her claims of medical malpractice are founded on allegations of a failure to timely diagnose and treat her son's epidural hematoma. Her allegations of a violation of EMTALA are strikingly similar: a failure to properly diagnose her son's medical condition. Here, in conformance with EMTALA's dialect, Ms. Wadensten claims that South County Hospital failed to perform an "appropriate medical screening examination", thereby failing to properly diagnose her son's condition. No matter how we word the plaintiff's claims, though, she alleges that her son was not properly diagnosed as the result of a faulty examination by the Hospital's co-defendants.

Congress passed EMTALA in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act in response to a growing concern that hospitals were "dumping" patients unable to pay, by either refusing to provide emergency medical treatment or by transferring patients before their emergency conditions were stabilized.

The statutory scheme of EMTALA and its requirements were delineated in the First Circuit Court of Appeals case of *Correa v. Hospital San Francisco, 69 F. 3d 1184, 1189 (1st Cir. 1995), cert denied, 517 U.S. 1136, 116 S. Ct. 1423, 134 L. Ed. 2d 547 (1996)*. There, the United States Court of Appeals for the First Circuit initially addressed the Act's congressional history, and then interpreted the provisions of EMTALA. The Court noted that "Congress became concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." *Correa, 69 F. 3d at 1189, citing* H.R.Rep.No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605.

In *Correa,* the Court referred to the two "linchpin" provisions of the Act. *Id. at 1190.* First, the Court recognized that EMTALA requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. 42 U.S.C. § 1395dd(a). Second, the Court recognized that the Act requires that, if an emergency medical condition exists, the participating hospital must render services that are necessary to stabilize the patient's condition, 42 U.S.C. § 1395dd(b)(1)(A), unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety. 42 U.S.C. § 1395(b)(1)(B),(c)(1). The Court also recognized that EMTALA establishes monetary penalties for noncompliance and authorizes private rights of action. 42 U.S.C.§§ 1395dd(d)(1) and 1395dd(d)(2). *See Correa at 1190.*

The Court in *Correa* found that in order to establish an EMTALA violation, a plaintiff must show that (1) a hospital is a participating hospital, covered by EMTALA, that operates an emergency department or an equivalent treatment facility; (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) "bade farewell to the patient", whether by turning the patient away, discharging the patient, or "improvidently transferring" the patient, without first stabilizing the emergency medical condition. *Correa at 1190, citing Miller v, Medical Ctr. Of S.W.La., 22 F. 3d 626, 628 (5th Cir. 1994); Stevison v. Enid Health Sys., Inc., 920 F. 2d 710, 712 (10th Cir. 1990).*

At issue in the present case is whether Max Wadensten was provided an appropriate medical screening examination within the context of EMTALA's requirements.

In *Correa*, after noting that the word "appropriateness" is "one of the most wonderful weasel words in the dictionary", the Court recognized that there has in fact been a level of consensus achieved as to a method of assessing the "appropriateness" of a medical condition for purposes of EMTALA. *Correa at 1192.* "A hospital fulfills its statutory duty to screen patients in its emergency room it if provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present with substantially similar complaints." *Id.* "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." *Id.*

The Court in the *Correa* case went on to "add a caveat: EMTALA does not create a cause of action for medical malpractice." *Id., citing Gatewood v. Washington Healthcare Corp., 290 U.S. App. D.C. 31, 933 F. 2d 1027, 1041 (D.C. Cir. 1991).*

"Therefore, a refusal to follow regular screening procedures in a particular instance contravenes the statute [citations omitted] but faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute." *Correa at 1192, citing Brooks v. Maryland Gen, Hosp., 996 F. 2d 708, 711 (4th Cir. 1993).* Here, there is neither an argument by the plaintiff or any evidence, of a refusal to follow regular screening procedures. Instead, plaintiff claims the Hospital, through the actions of its co-defendants, performed a faulty screening examination by failing to obtain a CT scan of the patient's head and/or by failing to require that Max be observed in the Hospital for a longer period of time than he actually was.

Courts have long recognized that a hospital's obligations under EMTALA are measured by whether it treats every patient perceived to have the same medical condition in the same manner. *See Phillips v. Hillcrest Medical Center, 244 F. 3d 790, 797-98 (10th Cir. 2001).* Similarly, it has been held that EMTALA focuses on the uniform treatment of patients who present to a hospital's emergency department, and does not create a federal cause of action for medical malpractice in emergency departments. *See Hunt v. Lincoln County Memorial Hospital, et al., 317 F. 3d 891, 894 (8th Cir. 2003); Correa v. Hospital San Francisco, 69 F. 3d 1184, 1189 (1st Cir. 1995), cert denied, 517 U.S. 1136, 116 S. Ct. 1423, 134 L. Ed. 2d 547 (1996).*

Under EMTALA, patients are entitled not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated. *Hunt v. Lincoln, supra; Battle v. Memorial Hospital at Gulfport, 228 F. 3d 544(5th Cir. 2000).*

In the often cited case of *Gatewood v. Washington Healthcare Corp., 933 F. 2d 1037, 1041 (D.C. Cir. 1991),* the United States Court of Appeals for the District of Columbia Circuit stated the following rule:

> [T]he Act [EMTALA] is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances. Thus, what constitutes an "appropriate" screening is properly determined not by reference to particular outcomes but instead by reference to a hospital's standard screening procedures.

Generally speaking, the Act was designed to prevent hospitals from refusing to examine or examining and then transferring or "dumping" patients to other facilities. What Congress did *not* intend is that EMTALA be used as a surrogate for a missing federal medical malpractice statute. *See Correa, supra.* In the case of *Guadalupe v. Negron, et al., 299 F. 3d 15, 21 (1st Cir. 2002)*, the United States Court of Appeals for the First Circuit recognized the important distinction between EMTALA and a medical malpractice claim. There, the court held that the issue under EMTALA is not what deficiencies in the standard of care contributed to a misdiagnosis, but rather whether the procedures followed in an emergency department, even if they resulted in a misdiagnosis, were reasonably calculated to identify a patient's critical medical condition. *See also Jackson v. East Bay Hospital, 246 F. 3d 1248, 1255 (9th Cir. 2001); Eberhardt v. City of Los Angeles, 62 F. 3d 1253, 1258 (9th Cir. 1995).*

In the *Correa v. Hospital San Francisco* case, the federal appellate court concluded that the patient was effectively denied a screening examination. The facts of that case are readily distinguishable from those before this Court. In *Correa*, the patient presented to the emergency department of the hospital with complaints of chills, cold sweats, dizziness and chest pain. The patient's son implored the receptionist to have someone take care of his mother. The patient was assigned a number, and essentially told to bide her time. After several hours passed without ever

being examined, the patient left the facility and went elsewhere, where her condition continued to deteriorate and where she expired shortly thereafter. The Court of Appeals concluded that the delay in attending to the patient was "so egregious and lacking in justification as to amount to an effective denial of a screening examination". *69 F. 3d at 1193.*

EMTALA requires Medicare participating hospitals to create and implement a *process* of evaluating patients who present to their emergency departments that is reasonably calculated to determine if the patient has an emergency medical condition. The medical screening examination is limited to the capability of a hospital's emergency department, and the purpose of the examination is to determine whether or not an emergency condition exists. 42 U.S.C.S. § 1395dd(a).

In cases throughout the First Circuit, trial courts have granted summary judgment in favor of defendant hospitals. In the case of *Hart et al. v. Mazur et al., 903 F. Supp. 277 (D.R.I. 1995),* the Court addressed certain Rule 12(b)(1) motions and referred to EMTALA in its holding. There, the Court noted the following:

> The Court reads Correa as forbidding any attempt to bring state misdiagnoses by health care providers – under EMTALA. Congress did not intend to expose defendant hospitals to attack along a new flank. Nor did it intend to turn the federal courts into a fora (sic) for state malpractice claims. Rather, it provided a limited federal remedy to plaintiff who had sought, and been denied, aid in emergency rooms. *Id. at 280.*

Thereafter, the Court dismissed four claims which it referred to as being "born of a shotgun marriage between EMTALA and traditional, common-law medical negligence doctrines." *Id.*

There is ample precedent within the First Circuit to support the proposition that plaintiff's claims sound only in traditional notions of tort and negligence and not in EMTALA. In *Martinez et*

*al. v. Hospital Menonita De Cayey et al., 32 Fed. App. 591 (1st Cir. 2002),* for example, the plaintiff alleged violations of EMTALA when an emergency department failed to identify an emergency condition which existed following the ingestion of a pork chop bone. The Court of Appeals for the First Circuit upheld the lower court's granting of summary judgment on the grounds that EMTALA "protects against differential treatment, not negligence" and that "faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute." *Id. at 592.*

In the case of *Reynolds et al. v. Mainegeneral Health, 218 F.3d 78 (1st Cir. 2000),* the plaintiffs' decedent was brought to an emergency department following a serious automobile accident and underwent surgery to his right leg. The patient's family informed the emergency department staff of a family history of clotting problems, however, this information may have gone unprocessed. The patient subsequently died of a massive pulmonary embolism less than a week after the surgery and within one day of discharge. *Id. at 81.* The EMTALA issue in that case was whether the increased risk of DVTs [deep venous thrombosis] associated with this injury, combined with a family history of hypercoagulability, triggered a duty to screen for DVTs.

Similar to the holding in the *Martinez* case, the First Circuit Court of Appeals ruled that where a screening exam actually took place, allegations which sound in medical negligence due to some inadequacy or failure of the exam, were state law malpractice claims and were not properly brought under EMTALA's screening requirements. In order to recover for disparate treatment pursuant to EMTALA, a plaintiff must proffer evidence sufficient to support a finding that they received materially different screening than that provided to others in their condition. *Id. at 83.* "It is not enough to proffer expert testimony of what treatment **should** have been provided to a patient in

[the plaintiff's] condition." *Id.* Although the plaintiff in that case was able to point to evidence of a written hospital policy and procedure whereby the hospital had a policy of taking a 'complete history', that was allegedly not performed in this case, the Court there found this as further evidence of simple negligence and not evidence of disparate treatment. *Id. at 83-84.* The First Circuit affirmed the lower court's decision dismissing the EMTALA claims based upon a failure to demonstrate evidence of disparate treatment.

While the facts of the case are somewhat more complex, *Colon et al. v. Hospital Dr. Pila et al., 330 F. Supp. 2d 38 (D.P.R. 2004)* involved a allegations by the plaintiff that the "defendants violated EMTALA because, in failing to perform certain tests and medical procedures, defendants essentially 'dumped' the patient and did not conduct a screening aimed at identifying the patient's medical condition." *Id. at 44.*

In granting summary judgment to the defendant hospital, the federal district court noted that "in claims asserting inadequate screening, the plaintiff bears the burden of proving that in screening him or her, the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions." *Id. at 43.* "The essence of this requirement is that there be some screening procedure, and that it be administered evenhandedly." *Id. quoting Correa, 69 F.3d at 1192.* The Court looked to the patient's own medical record in determining that the screening exam was "reasonably calculated to identify [the patient's] critical medical conditions." *Id. at 44.* "The fact that the procedures performed did not achieve the desired result is not sufficient for a claim that is actionable under EMTALA." *Id.*

In the case of *Gil et al. v. Hospital Dr. Alejandro Otero et al., 273 F. Supp. 2d 180 (D.P.R. 2003),* an eight month old child was brought to the defendant's emergency department suffering from

rectal bleeding and other symptoms that were incorrectly diagnosed as gastritis. In reality, the child was suffering from a bowel obstruction. *Id.* There, the plaintiff claimed EMTALA violations based upon the defendants' violation of their hospital's policies, which provided that a "specialist" will be consulted when an emergency room physician deems it necessary, and further claiming that the hospital's protocol regarding "Interdepartmental Relationship of the Emergency Department with other Departments in the Hospital" somehow created a duty for the emergency department physician to order x-rays.

The Court found both arguments unpersuasive, holding that these are strictly discretionary functions. Whether they are performed negligently, to the detriment of a particular patient, is an issue to be dealt with in a malpractice context and not under EMTALA. The Court further gave significant credence to the discretionary nature of specialist consultation mechanisms and the interdepartmental relationship protocol, stating that plaintiff's allegations "address the propriety and competency of [the defendant's] treatment and medical judgment and in no way amount to a cognizable claim under EMTALA." *Id. at 184.* "Whether the decisions of individual physicians involved in this unfortunate incident were erroneous, or even negligent, is beyond the realm of EMTALA and more in the province of medical malpractice." *Id.*

## Analysis

### I. An Appropriate Medical Screening Examination Was Performed and, Therefore, Defendant South County Hospital Is Entitled to Summary Judgment As To All of Plaintiff's EMTALA Claims.

Defendant South County Hospital submits that, here, there can be no dispute that Max

Wadensten was, in fact, examined and evaluated, assessed, treated, and cared for, while in the Hospital's emergency department on October 25, 2003. The plaintiff and her experts may question the adequacy and appropriateness of that care and treatment, but there can be no dispute that Max was examined and evaluated. His medical condition was assessed by a professional healthcare provided, a registered nurse practitioner credentialed by the Hospital, licensed by the State of Rhode Island, and who held privileges to practice healthcare.

Defendants South County Hospital and Rhode Island Emergency Physicians, Inc. contractually agreed to the provision of emergency department services at the Hospital by employees of that corporation. The Hospital specifically contracted with that corporation to provide emergency medical care to patients who presented to the emergency department. The defendant employees of Rhode Island Emergency Physicians, Inc. were credentialed by the Hospital and were granted privileges to provide healthcare services to patients presenting to the Hospital's emergency department. It is absurd to suggest that Pamela Burlingame, R.N.P. was not qualified to have examined, treated, or discharged Max Wadensten on October 25, 2003.

Attached to this Memorandum are the reports of several of the Hospital's expert witnesses which state unequivocally that (1) Pamela Burlingame, R.N.P. was properly credentialed to perform medical screening examinations at the Hospital in October 2003, (2) an appropriate medical screening examination was, in fact, performed on Max Wadensten on October 25, 2003, and (3) EMTALA's stabilization requirement was not triggered by the child's presentation to the emergency department on that day. *See Curriculum Vitae and Expert Reports of Robert Bitterman, M.D. and Mark S. Moy, M.D., attached hereto.* In addition, attached please find the transcripts of the deposition testimony of Dr. Bitterman and Dr. Moy, incorporated herein by reference.

Plaintiff claims that South County Hospital violated the requirements of EMTALA by failing to perform an "appropriate" medical screening examination during the course of Max Wadensten's initial visit to the emergency department on October 25, 2003. She has asserted the jurisdiction of this federal court through her EMTALA claims. The Hospital submits that an analysis of plaintiff's EMTALA claims of an inappropriate medical screening examination directly parallel her claims of medical malpractice and negligence. This federal court is not the proper forum for plaintiff's lawsuit; that forum is the Superior Court for the State of Rhode Island.

The Hospital further submits that after a review of the holdings of the various cases cited above, and an analysis of Pamela Burlingame's well-documented examination of Max Wadensten, there can be no doubt that an "appropriate" screening examination, as that term has been interpreted by the First Circuit Court of Appeals in *Correa,* was performed.

Pamela Burlingame, R.N.P. noted on the child's emergency department record of October 25, 2003, the history of the incident as it was communicated to her by both Ms. Wadensten and the babysitter, Jennifer Weiss. She noted that the babysitter had picked the child up out of his stroller and that the family dogs had banged into Ms. Weiss, causing her to drop the child one to two feet onto the floor.

She noted that Max cried immediately, and that he did not ever lose consciousness.

She noted there was no evidence of decreased level of consciousness since his injury, and that there was pain and discomfort of the head.

Registered Nurse Practitioner Burlingame noted that the child's past medical history was negative, including an absence of any allergies to medications.

She performed a review of the child's systems, including a determination that Max was not

lethargic or persistently crying, that he was not nauseated, had not vomited, was not suffering from a laceration or rash, and had no history of recent fever or illness.

She engaged in discussion with child's mother and babysitter and, according to her deposition testimony, asked if the child seemed alright to the mother.

She physically examined the child, noting him to be active and in no acute distress. The child's attentiveness was determined by Pamela Burlingame to be normal, and he smiled and made eye contact with her.

Max's neck was palpated and determined to be non-tender.

An examination of his trachea was normal.

An examination of his thyroid was also determined to be normal.

Pamela Burlingame examined the child's pupils and concluded that they were equal, regular, and reactive to light. Extraocular eye movements were noted by her to be intact.

She examined the child's pharynx, and concluded it was normal.

She performed a neurologic examination which revealed no apparent motor or sensory deficits. Her examination included testing of the child's cranial nerves, and she determined the cranial nerves to be normal as tested.

There was a bump in the child's right occipital region, but Ms. Burlingame noted there was no erythema or crepitus.

Pamela Burlingame conducted a respiratory examination of the child which revealed no respiratory distress, normal breath sounds, and a non-tender chest.

A cardiac examination revealed normal heart sounds and strong peripheral pulses.

The screening examination continued with Registered Nurse Practitioner Burlingame

examining the child's abdomen, and concluding that it was non-tender and there was no organomegaly. She examined the patient's back, and similarly concluded that it was non-tender, with the skin warm, dry and intact.

Max's extremities were examined and determined to be non-tender with normal range of motion. His pelvis was assessed and determined to be stable, and his hips were noted to be non-tender by Pamela Burlingame.

In addition, Nurse Practitioner Burlingame also documented her findings on a note she prepared early in the morning hours on the following day, at 2:30 a.m. on October 26, 2003. She prepared that note for her own records in light of the developments surrounding the child's second visit to the emergency department later the preceding day, and his transfer to Hasbro Children's Hospital. In her notes, she documents the following:

- Examination revealed a small soft bump over the right occipital skull without bruising, redness, laceration or abrasion;
- The skull was easily palpated under the bump and there was no step-off or crepitus felt;
- Maximus was noted to be appropriately tender in this area;
- There were no other bumps, bruises, or swelling noted;
- The child's anterior fontanel was determined to be open and flat;
- His pupils were equal and reactive and his red reflex was intact bilaterally though fundoscopic examination was limited there were no obvious hemorrhages seen by her;
- Extracocular movements appeared to be intact and both pupils were noted to be

normal;

- There was no hemotypanum seen;

- Ears were examined with the otoscope without evidence of rhinorrhea or epistaxis;

- There was no periorbital hematoma or swelling;

- There were no Battle's sign present;

- While the child was crying, his oral mucosa and posterior pharynx were visualized and not abnormalities seen;

- His skin was moist and pink;

- The child's heart rate was 120-130 and regular when crying;

- His lungs were clear;

- Peripheral pulses were easily palpated;

- Capillary refill was noted to be brisk;

- Max's back was examined for any sign of injury;

- There were no bruises, abrasion, erythema or swelling observed;

- His arms and legs were without obvious injury;

- He was moving all extremities freely;

- He was easily consoled by his mother;

- The child's abdomen was soft with good bowel sounds, non-tender, and specifically without splenomegaly or pain response with palpation over his liver and spleen; and

- Genitalia were inspected briefly without unusual finding.

Nurse Practitioner Burlingame noted the child had a contusion of the head, and further noted a diagnosis of a minor head injury. She noted that she discussed surveillance of the child with Ms.

Wadensten and the babysitter. She noted that they would return if there was any change in his condition. She noted there was no evidence of other injury seen, old or new. The disposition of the child was to return home, and he was noted to be in stable condition. In addition, Pamela Burlingame, R.N.P. provided the child's mother with a discharge instruction sheet with specific instructions.

Max Wadensten's medical records reflect a medical screening examination that was appropriate in its scope and breadth. Here, there was no evidence of a refusal to perform a medical screening examination or even of a disparate examination. Plaintiff 's allegations are that the screening examination was, in the words of the Court in *Correa*, "faulty", and "faulty" screening examinations simply do not contravene the statute. *69 F. 3d 1184 at 1193.*

## II. There Is No Evidence Of Disparate Treatment Here and, Therefore, Defendant South County Hospital Is Entitled to Summary Judgment As To All of Plaintiff's EMTALA Claims

The Hospital submits that Max Wadensten underwent a similar process for medical screening undertaken on other patients who presented to the Hospital's emergency department with similar complaints. Max was triaged, his vital signs were taken, and he was placed in an examining room. He was examined by a professional licensed healthcare provider credentialed to screen him for an emergency medical condition, and a history and physical examination were performed, including a neurological examination. The family and caregiver were informed of the diagnosis and were provided with specific oral and written discharge instructions.

This is the same process provided to other children with minor falls and head trauma. This was a non-discriminatory process. Max Wadensten was cared for, screened, examined, evaluated, assessed, and treated in the same way and through the same processes as other children who presented to the emergency department of South County Hospital. There was no deviation from the Hospital's normal screening process for patients with similar presentations, as required by EMTALA. Plaintiff's argument that the Hospital and the other party defendants should have done more for the child is an argument which falls outside of EMTALA's coverage and instead falls squarely within the context of a state medical negligence claim.

It is the *process* which needs to be judged under EMTALA, not whether the diagnoses or treatment plans of an individual provider were correct at the time, or whether a certain diagnostic test should have been ordered, or a medication prescribed, a test performed, or a treatment modality considered. Those are all questions for another forum with another set of standards: "standards of care".

In support of its position that Max Wadensten most certainly did not receive disparate care or treatment, the Hospital attaches hereto a copy of its Third Supplemental Answer to plaintiff's interrogatory numbered 17. That attachment contains a spreadsheet which states the admission date and patient age of all children ages eighteen [18] and younger who presented to the South County Hospital's emergency department with "substantially similar" symptoms/complaints from January 1, 2001 to August 29, 2005, which was the date of discovery compliance.

Plaintiff argues that South County Hospital failed to perform an appropriate medical screening examination because a CT scan of the head was not ordered at the time of Max's initial presentation to its emergency department. The attached spreadsheet shows that not every child who

presented to the Hospital's emergency department with complaints of minor head trauma underwent a CT scan of the head. The Hospital's own data clearly shows that CT scans were ordered for some head trauma patients, and not for others. The issue under EMTALA is whether there was a disparity of treatment; the question is not whether professional standards of care were met.

Here, there can be no question that Max Wadensten was treated in a manner consistent with the treatment provided to all other children who presented to South County Hospital with similar complaints.

Referring once again to the case of *Correa v. Hospital San Francisco, 69 F. 3d 1184 (1st Cir. 1995), cert denied, 517 U.S. 1136, 116 S. Ct. 1423, 134 L. Ed. 2d 547 (1996):*

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present with substantially similar complaints. [*Citations omitted*] The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly.

*60 F. 3d at 1192.*

## Conclusion

The plaintiff contends that the defendants' professional perceptions, judgments, and conclusions regarding Maximus Wadensten's diagnosis were wrong, and that they should have considered the diagnosis of epidural hematoma or intracranial hemorrhage, observed the patient for a longer period of time, and/or obtained a CT head scan. Plaintiff's contention is an ordinary malpractice allegation for failure to meet the applicable standards of care in diagnosing the child's symptoms and physical findings, and is **not** an EMTALA claim for failure to conduct an "appropriate

medical screening examination" under federal law.

Defendant South County Hospital further submits that it cannot be held liable under EMTALA for failure to stabilize the child's emergency medical condition unless it actually determined that he was suffering from an emergency medical condition. Here, at the time of his initial visit and discharge on October 25, 2003, Maximus Wadensten was not diagnosed as suffering from an emergency medical condition. The Hospital had no actual knowledge that the patient had an intracranial bleed or other emergency condition, even if one may have been present at the time. Accordingly, the Hospital cannot be held liable under EMTALA for failure to stabilize that emergency medical condition, either.

For the foregoing reasons, defendant South County Hospital submits that there are no genuine issues of material fact supporting any of plaintiff's EMTALA claims against it. Plaintiff has failed to allege any facts sufficient to establish any viable claims under EMTALA. Further, the claims underlying the plaintiff's lawsuit sound in tort and negligence, namely ordinary medical malpractice, and as such, the federal court is not the appropriate forum for resolution of such disputes.

The plaintiff's allegations that the Hospital failed to properly assess or diagnose Maximus Wadensten's condition are germane to a state law negligence claim as to the compliance with applicable standards of care, and not whether the hospital complied with federal law.

Federal courts have regularly held that EMTALA is not a replacement for state tort claims of medical malpractice. Defendant South County Hospital respectfully urges this Court to recognize that the Act does not require a correct diagnosis of each and every patient presenting to the emergency department. The medical screening examination performed on Maximus Wadensten was within the capabilities of South County Hospital's emergency department. The screening

examination performed on Maximus Wadensten was of a kind which would have been offered to any other patient in a similar condition with similar symptoms. Further, the plaintiff has failed to show that the Hospital treated this child differently from other patients. Accordingly, as to plaintiff's EMTALA claims, the Hospital respectfully submits that summary judgment should properly be entered in its favor.

Respectfully submitted by:
Defendant,
**South County Hospital**
By its Attorneys,
**RATCLIFFE BURKE HARTEN & ELIAS, LLP**

Jay M. Elias, Esquire (#3050)
Paul F. Galamaga, Esquire (#5803)
1600 Financial Plaza
Providence, RI 02903
401.331.3400
401.331.3440 [Fax]

**CERTIFICATION**

I hereby certify that a true copy of the within was mailed, postage prepaid, on this 7 day of April 2006, to the following:

Amato A. DeLuca, Esquire
Miriam Weizenbaum, Esquire
DeLuca & Weizenbaum, Ltd.
199 North Main Street
Providence, RI 02903

Mark T. Nugent, Esquire
Paul V. Sullivan, Esquire
Morrison, Mahoney, LLP
121 South Main Street, Suite 600
Providence, RI 02903

Memo.Motionfor SummaryJudgment.04.03.06.doc

Peggy McLaughlin