**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **LINDA WADENSTEN, Individually and p.p.a. MAXIMUS WADENSTEN Plaintiffs,** | : | |
| **v.** | : | **C.A. No. 04-326S** |
| **SOUTH COUNTY HOSPITAL; PAMELA BURLINGAME, RNP; TIMOTHY DRURY, M.D. RHODE ISLAND EMERGENCY PHYSICIANS, INC. Defendants.** | : | |

**PLAINTIFF'S OBJECTION TO**
**DEFENDANT SOUTH COUNTY HOSPITAL'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW COME plaintiffs Linda and Maximus Wadensten and hereby object to defendant South County Hospital's motion for summary judgment on plaintiffs' EMTALA claims.

Plaintiffs,
By their Attorneys,

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within was served on counsel of record listed below on this 26th day of April 2006 by first class mail:

Jay Elias, Esq.
Paul Galamaga, Esq.
Ratcliffe, Burke, Harten & Elias, LLP
1600 Financial Plaza
Providence, RI 02903

Mark T. Nugent, Esq.
Paul V. Sullivan, Esq.
Morrison, Mahoney, LLP
121 South Main Street, Suite 600
Providence, RI 02903

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **LINDA WADENSTEN, Individually and p.p.a. MAXIMUS WADENSTEN Plaintiffs,** | : | |
| **v.** | : | **C.A. No. 04-326S** |
| **SOUTH COUNTY HOSPITAL; PAMELA BURLINGAME, RNP; ROBERT J. CASCI, JR., D.O.; TIMOTHY DRURY, M.D. RHODE ISLAND EMERGENCY PHYSICIANS, INC. Defendants.** | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT SOUTH COUNTY HOSPITAL'S**
**MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

South County Hospital's motion for summary judgment on plaintiffs' EMTALA claims is without merit. Its principal flaw is that it pretends away the fact that there is abundant record evidence supporting plaintiff's claim that the hospital subjected Maximus Wadensten to unlawful disparate treatment – denied him an "appropriate medical screening exam" – in violation of EMTALA when it discharged him from the emergency department without following the policies and standards that it regularly observes for other patients presenting with substantially similar conditions. The record evidence demonstrates that the hospital deviated from its standard procedures in assessing Max for an emergency medical condition in three important respects.

First, the hospital failed to provide Max with critical nursing assessments, which, according to the hospital's own written "EMTALA" policy, are required for every emergency-department patient. Here, notwithstanding defendant nurse-practitioner ("NP")

Burlingame's incredible claim that the requisite nursing assessments were made, there is a surfeit of evidence showing that these clinically significant assessments were simply not provided to Max. Had these assessments been performed, the hospital more probably than not would have seen what Max's mother observed: that he became drowsy and dozed before being discharged—a sign of change in mental status which would have resulted in a re-assessment that, more probably than not, would have led to the discovery of the intracranial bleed which, untreated, resulted in serious, permanent neurological injury to Max.

Second, the summary judgment record supports a finding that the hospital deviated from prevailing emergency department screening standards (thus violating EMTALA) when it permitted Maximus to be screened for a skull fracture by manual palpation instead of imagining. As the nurse-practitioner states repeatedly, based upon feeling the skull she concluded there was no fracture (in fact, of course, there was) and imagining was not needed. This extraordinary method not only violates standards of care, it constitutes a screening method for diagnosis of skull fracture not employed before or since, based upon the hospital's own documentation and admissions. According to the chief of the emergency department—defendant Dr. Drury—this method would only have worked with "x-ray fingers." More probably than not, had the hospital followed its screening standards for diagnosing/ruling-out a skull fracture in Max's case, as required by EMTALA, the resulting imaging studies would have led to an earlier diagnosis and effective treatment of his intracranial bleeding.

Third, the summary judgment record supports a finding that the hospital contravened its policies that permit patients triaged as "urgent", as Maximus appropriately was, to be treated only by physicians with advanced qualifications, Category II privileges. Stated otherwise, the hospital's policies required Max's care to be managed by a physician,

not a nurse-practitioner. It is undisputed that during the first, critical visit to the hospital's emergency department, Maximus was never seen by a physician. Based on Dr. Drury's deposition testimony indicating that he would have ordered imaging studies to rule out a skull fracture instead of merely palpating as NP Burlingame did, had Max's care been managed by a physician, it is more probable than not that the intracranial bleed would have been diagnosed during Max's first visit to the hospital.

South County Hospital committed a clear violation of a separate provision of EMTALA by denying the infant plaintiff a physician at the first visit. The hospital failed, as required by EMTALA regulations, to designate NP Burlingame in its bylaws or rules and regulations—or in any manner—as qualified to perform necessary and appropriate medical screening examinations for "urgent" patients like Max. As Max's evaluation and management were performed exclusively by NP Burlingame, it follows that the hospital violated EMTALA by not providing an appropriate medical screening examination by a properly designated "qualified medical person," as required by EMTALA regulations.

The hospital's attempts to muddy these EMTALA violations by focusing its statement of "undisputed" facts and its memorandum in support of summary judgment on *immaterial* matters with no relation whatsoever to the EMTALA issues now before the Court are ill-conceived and convey a "shrill ring of desperation." *Correa v. Hospital San Francisco,* 69 F. 3d 1184, 1191 (1st Cir. 1995)(summarily rejecting hospital's claim that plaintiff failed to prove that hospital was subject to EMTALA). Thus, the Court ought to disdain the hospital's irrelevant report that Max "is the product of *in vitro* fertilization and, as such, there are no claims in behalf of his biological father." Def. Mem. at 2.

Equally immaterial are the hospital's persistent attempts to vilify Max's babysitter, Jennifer Weiss, by gratuitously pointing out that she "is not a small woman" and arguing that

"instead of gripping Max more tightly, she chose to drop him." *Id.* at 4. The hospital's argument that the babysitter is to blame is a "non-starter" that has already been rejected by the Court in connection with the denial of the hospital's motion to file a third-party complaint adding add Ms. Weiss as a third-party defendant. *Cf. Cruz-Queipo v. Hospital Español Auxilio Mutuo de Peurto Rico,* 417 F. 3d 67, 72 n.6 (1st Cir. 2005)(rejecting as a "non-starter" defendant hospital's argument that it was entitled to summary judgment on plaintiff's EMTALA claims because plaintiff's injuries resulted from his failure to control his cholesterol and blood pressure, not the hospital's failure to follow its triage protocol when plaintiff presented with acute chest pain).

Disregarding the immaterial facts and issues obscuring the hospital's EMTALA argument, it becomes clear that the hospital's claim that it is entitled to summary judgment rests on two factual predicates: (1) Max "was, in fact, examined and evaluated, assessed, treated, and cared for, while in the Hospital's emergency department;" and (2) Max "underwent a similar process for medical screening undertaken on other patients who presented at the Hospital's emergency department with similar complaints." Def. Mem at 17, 22. Relying principally on the medical record, the hospital unnecessarily devotes most of its written argument to the first premise—*i.e.,* the extent to which Max was examined and evaluated by NP Burlingame—but fails completely to offer any facts on the dispositive EMTALA issues in this case—*i.e.,* (a) whether Max received the same screening procedure provided to all similarly situated patients; and (b) whether the hospital provided Max with an appropriate medical screening examination by a "qualified medical person."

The hospital's failure to offer factual support on these issues is not remedied by its misplaced reliance on answers to interrogatories suggesting that younger patients who

present with minor head trauma do not always receive CT scans. First, the data on which the hospital's answer is based shows that in nearly all instances, CT scans were performed.

Second, the data (drawn from nearly 500 cases) does not identify (as the interrogatory requested) a single instance in which a younger patient who presented with minor head trauma received palpation instead of a CT scan to rule out skull fracture. Significantly, the Wadenstens do not claim that an EMTALA violation occurred because the hospital failed to follow a policy of performing a CT scan whenever a younger patient *presents with minor head trauma.* The Wadenstens claim that the hospital deviated from its screening standards when it permitted the nurse-practitioner to rely on a non-standard method, manual palpation, rather than an imaging study to *determine whether Maximus had a fractured skull.* The hospital's data does not respond to the Wadenstens' disparate-treatment, palpation-for-skull-fracture EMTALA claim, properly conceived, and thus does not provide factual support against it.

Third, the hospital's data does not address plaintiffs' claims that the hospital violated EMTALA by failing to provide Max with a nursing assessment in accordance with its written screening policies and that it failed to provide physician management of Max's evaluation and care.

In sum, while plaintiffs reasonably rely on competent record evidence supporting findings and conclusions that Max's injuries proximately resulted from the hospital's violations of EMTALA, the hospital, in contrast, offers no factual support whatsoever on the dispositive EMTALA issues in this case—*i.e.,* (a) whether Maximus received the same screening procedure provided to all similarly situated patients; and (b) whether the hospital provided Max with an appropriate medical screening examination by a "qualified medical

person." As there are, at the very least, triable issues of material fact on the Wadenstens' EMTALA claims, the Court ought to deny the hospital's motion for summary judgment.

## FACTS AND TRAVEL

On October 25, 2003, Max Wadensten, then seven months old, was brought to the Emergency Department at South County Hospital after his head hit a hard, tile, floor at home. He was triaged as "urgent" at reception and then seen by a nurse-practitioner, defendant Burlingame, for evaluation and treatment. The emergency department record recorded the circumstances of the Max's fall, which occurred when his sitter was bumped by the family dogs and dropped Max while taking him out of his stroller. *See,* ED Record; copy attached as Exhibit A.

While NP Burlingame determined that it was necessary to establish whether Max had a fractured skull, she did not perform an imaging study in accordance with prevailing emergency department screening standards. Instead, she did something that not only deviated from the hospital's standards, but was incapable of diagnosing a skull fracture: she palpated Maximus's head. NP Burlingame explained her decision not to order an imaging study in her answers to interrogatories: "X-ray [of the skull] was not taken because I was able to palpate the skull directly under the site of injury and did not find evidence of depressed or linear skull fracture." *See,* NP Burlingame ATI #12; copy (partial) attached as Exhibit B. Dismissing palpation as an acceptable method of ruling our skull fracture, the hospital's physician responsible for supervising NP Burlingame—defendant Dr. Drury—testified at deposition that that method would only have worked with "x-ray fingers." *See,* Dr. Drury Dep. 5/23/05 at 39; copy (partial) attached as Exhibit C.

Notwithstanding the fact that Max exhibited signs of a change in mental status while in the emergency department—*i.e.*, he became drowsy and dozed—he was discharged

without re-assessment or an imaging study. *See, e.g.,* L. Wadensten Dep. 5/27/05 at 64-67, 71, 81-82, 183; copy (partial) attached as Exhibit D. Significantly, Max was discharged without re-assessment or imaging study in spite of the fact that even NP Burlingame acknowledged that a change in Max's mental status before discharge would have compelled further assessment and imaging. *See,* NP Burlingame Dep. 5/20/05 at 157-58; Exhibit E.

The record documenting NP Burlingame's evaluation and discharge was co-signed by Dr. Drury. Dr. Drury did not, however, see Max before his discharge from the emergency department. At the time of this first visit, Max had an undiagnosed skull fracture and a developing intracranial bleed. His mother was instructed by NP Burlingame that Max should be allowed to sleep for the next two hours and to watch for "unusual breathing, vomiting."

When Max was difficult to awaken at the end of his two hour nap, his mother and nanny returned with him to South County Hospital. The bleed was diagnosed at that time and Max was transported by MediVac to Hasbro Children's Hospital in Providence, where he underwent immediate surgery to alleviate pressure caused by a massive bleed between his skull and brain. Notwithstanding, the bleeding-induced pressure had advanced to the point of causing a partial herniation of the brain stem. Max's physicians at Hasbro Children's Hospital evaluated Max's care under the auspices of the Department of Child, Youth and Family and opined that Max should not have been discharged without imaging upon his first presentation at South County Hospital.

From birth until the date of his injury, Maximus Wadensten was a healthy, thriving infant. As a result of a massive bleed, necessary surgery, and swelling, however, Max sustained significant, permanent injuries, including cognitive and developmental delays and impaired vision and movement on his left side.

Claiming in essence that Max's injuries proximately resulted from the negligence of South County Hospital, NP Burlingame, and Dr. Drury, the Wadenstens brought the within action in July 2004. In addition to negligence claims, the Wadenstens claimed that the hospital's treatment and care of Max violated the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, which "requires a hospital to even-handedly administer an appropriate screening procedure to all emergency room patients and, if it determines that an emergency condition exists, to stabilize the patient's condition before discharge or transfer to another hospital." *Cruz-Queipo v. Hospital Español Auxilio Mutuo de Peurto Rico,* 417 F. 3d at 68.

Notwithstanding the fact that for some time after this action was commenced the hospital denied that it was subject to EMTALA,[1] when Max presented to the hospital's emergency department in October 2003, the hospital's governing board had long since adopted an EMTALA policy entitled "Transfer to Other Facilities." Among other things, in the Hospital Transfer Policy the hospital recognized its responsibility to comply with EMTALA and to implement its requirements, in particular those at issue in this case, that is, the provision of "an appropriate medical screening examination within the capability of the Hospital's Emergency Department" and the adoption of "appropriate rules or by-laws to determine who is a qualified medical person to perform necessary and appropriate medical screening examinations and to ensure that such individuals meet the requirements of state and federal law, rules and regulations." *See,* Hospital (Transfer) Policy #540, copy attached as Exhibit F.

[1] On June 27, 2005 the hospital filed a motion to amend its Answer to Complaint "based upon information obtained during the discovery process … in order to now admit that it is a covered entity pursuant to [EMTALA]". See Def. Motion for Leave of Court to Amend its Answer to the Plaintiff's Complaint and to File a Third Party Complaint, copy attached as Exhibit G.

In spite of the fact that the hospital's person with knowledge of its EMTALA policies testified at deposition that the Hospital Transfer Policy was the only document pertinent to its compliance with EMTALA, the hospital's emergency department clearly had in place other policies, protocols, practices, and standards intended to be applied "to even-handedly administer an appropriate screening procedure to all emergency room patients." Pertinent here, for instance, is the emergency department's "Assessment" policy and procedure, which specifically references EMTALA. *See*, ED (Assessment) Policy #255, copy attached as Exhibit H.

Recognizing the hospital's obligation under EMTALA to provide a uniform screening exam, the ED Assessment Policy states that its purpose "is to apply the same standards to "all Emergency Department patients" and to "ensure[] *parity of care* for *each patient* entering the Emergency Department." *Id.* (emphasis added). Thus the ED Assessment Policy requires the uniform assessment of all emergency department patients as follows:

> 1. All patients presenting to the Emergency Department will be assessed (triage assessment) by a registered nurse upon their arrival and assigned an acuity level.
> 2. All patients will receive a secondary assessment, and ongoing reassessment.
> 3. The ongoing nursing reassessment will be based upon the dynamic status of the patient and response to care.
> 4. All assessment and reassessment techniques will be sensitive to the patient's age-specific physical, developmental, cognitive, and psychosocial needs.
> 5. Each nurse will document significant patient data as appropriate to the nature and severity of the illness/injury.
> 6. Within 15 minutes prior to discharge, a nursing note will reflect the general condition of the patient as it relates to the triage chief compliant. Vital signs (TPR, BP, SaO2, Pain) will be repeated if abnormal.

*Id.*

Contravening the ED Assessment Policy, the medical records show that Max did not receive a single post-triage nursing assessment. *See*, ED Record; Exhibit A. Indeed, those

records show a complete absence of any nursing assessment, other than a triage assessment performed by Keri Moran, R.N.

While NP Burlingame claims (based on notes she made on her home computer at 2:30 A.M. on the morning after Max was taken by helicopter to Providence) that (a) the lack of record documentation of assessments was an oversight; (b) a nurse called Monna Reid assessed Max after triage; and (c) Ms. Reid was in the exam room at the first visit,[2] nurse Reid does not support NP Burlingame's account.[3]

In addition to requiring a hospital to "even-handedly administer an appropriate screening procedure to all emergency room patients," EMTALA regulations require that an

---

[2] In her post-incident notes, typed on her home computer, NP Burlingame wrote "Monna had forgotten to do nurses notes from the first ER visit but would be asked by Lee on Sunday to complete a note." *See,* NP Burlingame Notes, copy attached as Exhibit I. Defendant Burlingame elaborated on this construct in her Answers to Interrogatories, where she stated: "I believe Monna Reid, the RN assigned to Maximus, also was present during the examination and discharge instructions," and that she "spoke directly with Monna Reid, R.N. regarding her observations and assessment of Maximus[;] * * * Nurse Reid was present in the treatment room for the majority of the time that I was in the room both before and during discharge." *See,* Answer to Interrogatory Nos. 16 & 20, partial copy attached as Exhibit B.

[3] Contradicting NP Burlingame, Ms. Reid testified at deposition as follows:

Q. So you have no recollection of seeing Max at 3:44
or any time in the afternoon, correct?
MR. NUGENT: Objection.
A. Correct.
Q. But do you have a recollection of seeing him that
evening, correct?
MR. NUGENT: Objection.
A. Yes.
Q. And it would be fair to say that if you had seen
him and did an assessment or were present, you
would have recorded that information in this
chart as part of your usual practice?
MR. NUGENT: Objection.
A. Yes.

Dep. M. Reid, R.N., 7/28/05, at 80, copy (partial) attached as Exhibit J. *See also, id.* at 130-33.

"appropriate medical screening examination * * * *must be conducted by an individual(s) who is determined qualified by hospital bylaws or rules and regulations.*" 42 C.F.R. §489.24(a)(1)(emphasis added). While the hospital has no bylaws or rules and regulations which specifically delineate qualified medical persons to perform necessary and appropriate medical screening examinations, its policies and privileging system make clear that NP Burlingame did not have the necessary qualifications to perform an appropriate medical screening examination on an urgent patient who came to the hospital's emergency department in Max's condition.

One of the initial steps when a person arrives at the hospital's emergency department is for a triage nurse to prioritize the patient according to an "assessment of urgency of medical need." *See,* ED (Triage) Policy #200 at 1, copy attached as Exhibit K. Patients who are assessed as "non-urgent"—*i.e.,* where "treatment is not a critical factor" and who "may be treated several hours after arrival—"[t]ypically may be seen in Express Care." *Id.* at 2. Patients, like Max, who are assessed as "urgent"—*i.e.,* "a major illness or injury requiring treatment within 30 minutes (ideally)"—"should typically be seen in the main emergency room." *Id.*

The triage category assigned by the triage nurse then determines the necessary qualifications of the physician who assumes responsibility for the patient, in accordance with the following hospital policies. First, ED (Physician) Policy #170 separates emergency department physicians into two categories. *See* ED Physician Policy #170, copy attached as Exhibit L. "Category I" ED physicians are required to have two-years of post-graduate training and/or experience, including an approved internship in medicine, surgery, family medicine, or emergency medicine. *Id.* at 2. "Physicians in Category I are only permitted to work in Express Care"—or, in other words, on patients assessed as "non-urgent" (*e.g,* ear

ache, cold, urinary tract infection, back aches, minor nosebleeds, sore throat). *See,* ED Physician Policy at 2; ED Triage Policy at 2.

Physicians in "Category II" must have *three*-years of post-graduate training and/or experience including an approved internship in medicine, surgery, family medicine, or emergency medicine, and "formal training in intensive care." ED Physician Policy at 2. Significantly, a Category II emergency department physician is not restricted to treating non-urgent patients in Express Care, but "may work the full Emergency Department." *Id.*

As a nurse practitioner assigned to the emergency department, NP Burlingame's privileges were not granted in the same manner as an emergency department physician. Instead, her privileges to treat patients in the emergency department were granted consistent with the hospital's Definitions for Delineation of Clinical Privileges in the emergency department. *See,* Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; copies attached as Exhibit M. Those definitions specify that "Privileges for a Nurse Practitioner/Physician Assistant *to perform certain procedures such as those listed above in the definition of Category 2* privileges may be granted on an individual basis …" *See,* Definitions; Exhibit M. Thus, the hospital granted NP Burlingame "Category I" ED physician privileges, as set forth on a list of Specified Services for Nurse Practitioners, i.e., to treat patients assessed as "non-urgent", and specific Category II procedures. *See,* Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; Exhibit M. The remainder of the NP's privileges are neither Category I nor Category II as they are not physician privileges, that is, they do not extend to the discharge of patients.

None of the privileges possessed by NP Burlingame when Max arrived at the emergency room in October 2003 support a conclusion that she was designated by the hospital as a "qualified medical person" to perform an appropriate medical screening

examinations on an urgent patient who came to the hospital's emergency department in Max's condition. Indeed, the hospital's policies compel an entirely different inference: having completed only nursing school, and a three-year, part-time, nurse-practitioner program in Family Practice, NP Burlingame fell far short of possessing the credentials necessary to perform an appropriate medical screening examination on Max.

More probably than not, had the hospital not failed to follow its own ED assessment, skull-fracture, and physician/nurse practitioner screening and practice policies and standards, and had it provided Max with an appropriate medical screening examination by a properly designated qualified medical person, Max's intracranial bleeding would have been diagnosed on his first visit to the hospital's emergency department on October 25, 2003, and the serious, permanent neurological injuries resulting from the undiagnosed and untreated intracranial bleed would have been avoided. *See,* R. Barkin, M.D., Dep. at 66-74, 107-111; copy (partial) attached as Exhibit N.

Now before the Court is the hospital's motion for summary judgment on the Wadenstens' EMTALA claims. In essence, the hospital contends that it is entitled to summary judgment because Max "was, in fact, examined and evaluated, assessed, treated, and cared for, while in the Hospital's emergency department" and "underwent a similar process for medical screening undertaken on other patients who presented at the Hospital's emergency department with similar complaints." Def. Mem at 17, 22.

The hospital's motion is without merit. The summary judgment record contains sufficient evidence to support a conclusion that the hospital subjected Max to unlawful disparate treatment in violation of EMTALA when it discharged him from the emergency department without following the policies and standards that it regularly observes for other patients presenting with substantially similar conditions. The summary judgment record

similarly contains evidence sufficient to support a finding that the hospital violated EMTALA by not providing a properly designated "qualified medical person," as required by EMTALA regulations, the perform the medical screening examination. For these reasons, the Court ought to deny the hospital's motion for partial summary judgment.

## ARGUMENT

### I. The summary judgment record amply supports plaintiff's claim that the hospital subjected Maximus Wadensten to unlawful disparate treatment in violation of EMTALA; as such the hospital's partial summary-judgment motion is without merit.

It is undisputed that defendant South County Hospital is a participating hospital for purposes of EMTALA. As such, the hospital is subject to two primary requirements: first, it must afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance; and, second, if an emergency medical condition exists, it must render the services that are necessary to stabilize the patient's condition. *See,* 42 U.S.C. §§ 1395dd(a) & (b)(1)(A); *Cruz-Queipo v. Hospital Español Auxilio Mutuo de Peurto Rico,* 417 F. 3d at 68 (citing *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1189 (1st Cir. 1995)). Although EMTALA does not define an "appropriate medical screening examination," First Circuit law does:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a *screening examination reasonably calculated to identify critical medical conditions* that may be afflicting symptomatic patients and provides that level of screening *uniformly to all those who present substantially similar complaints.*

*Cruz-Queipo,* 417 F. 3d at 70 (emphasis added)(quoting *Correa v. Hosp. San Francisco,* 69 F.3d at 1192). The essence of the requirement "is that there be *some screening procedure*, and that it be *administered even-handedly.*" *Id.,* 417 F.3d at 70 (emphasis added)(quoting *Correa v. Hosp. San Francisco,* 69 F.3d at 1192); *see also, e.g., Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d

1132, 1138 (8th Cir. 1996)("An inappropriate screening examination is one that has a disparate impact on the plaintiff. Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities.").

Importantly, "[w]hen a hospital prescribes internal procedures for a screening examination, those *internal procedures set the parameters for an appropriate screening.* A *hospital* thus *must adhere to its own procedures in administering the screening examination.*" *Cruz-Queipo,* 417 F. 3d at 70 (emphasis added)(internal quotation marks and footnote reference omitted)(quoting *Correa v. Hosp. San Francisco,* 69 F.3d at 1192); *see also, e.g., Summers v. Baptist Medical Center Arkadelphia,* 91 F.3d at 1138 ("It is up to the hospital itself to determine what its screening procedures will be. Having done so, it must apply them alike to all patients."). Thus, a departure from hospital standards, which set the parameters for an appropriate screening, constitutes a denial of an appropriate screening examination in violation of EMTALA. *See, e.g., Cruz-Queipo,* 417 F. 3d at 71 (placement of patient in non-urgent triage Category IV despite a complaint of chest pains which should have placed patient in urgent Category II "marked a departure from the hospital's standards" and precluded summary judgment for hospital on plaintiffs' claim that plaintiffs' decedent was denied an appropriate screening in violation of EMTALA).

Significantly, it is no defense to an EMTALA claim that a hospital's emergency department performed a "battery" of tests and evaluations on a patient. So long as there is a material departure from hospital standards, a patient is denied an appropriate screening examination in violation of EMTALA regardless of the number and variety of assessments, evaluations, and tests performed. *See, e.g., Cruz-Queipo,* 417 F. 3d at 70 (disparate treatment evidenced by departure from hospital standards in triage of patient with chest pains

precluded summary judgment for hospital on EMTALA claims despite facts that patient received an initial screening examination and a more thorough evaluation from two physicians and an EKG and x-rays were ordered and interpreted as negative); *Romo v. Union Memorial Hosp. Inc.,* 878 F. Supp. 837, 842 (W.D.N.C. 1995)(denying hospital's motion for summary judgment, court noted that in spite of fact that defendant hospital "attended to [plaintiff's decedent] and treated him with a variety, or in his words 'a battery,' of tests and evaluations, it may still fall short of an 'appropriate medical screening,' if there is evidence that the nature, extent and timing of these actions differs from the standard operating procedures received by other paying patients").

Here, notwithstanding the fact that the hospital devotes a great deal of attention in its moving papers to the examinations and evaluations that it administered to Max, it overlooks the fact that there is abundant record evidence showing that it materially departed from hospital screening standards in three separate and distinct ways and, as such, three times denied Max of an appropriate screening examination in violation of EMTALA. Plainly, the hospital's claim that it is entitled to summary judgment on the Wadenstens' EMTALA claims is fundamentally misinformed.

**A. The hospital failed to provide Maximus with critical nursing assessments, which, according to the hospital's own written "EMTALA" policy, are required for every emergency-department patient.**

Pursuant to the hospital's ED Assessment Policy—which specifically references EMTALA—every patient coming to the emergency department for treatment must receive several assessments, including a triage assessment, an initial post-triage nursing assessment, an ongoing nursing assessment, and a pre-discharge nursing assessment. Other than the triage assessment performed when Max first arrived at the hospital, when the summary judgment record is viewed in a light most favorable to the Wadenstens (as, for present

purposes, it must be), it clearly supports a finding that the hospital failed to perform all of the other nursing assessments prescribed by the hospital's ED Assessment Policy.

The Assessment policy requires documentation of nursing assessments. In violation of this portion of the policy, the medical records for Max's first ED visit clearly support a finding that no nurse performed a post-triage nursing assessment as mandated by South County Hospital's EMTALA assessment policy. Thus, on the "Face Sheet," where there is a space for the name of the assigned nurse, no nurse is identified. *See,* Exhibit A. Similarly, on the "E.D. Record'" the documentation was filled in by the triage nurse, NP Burlingame has signed the discharge instruction section at the bottom at the signature line for the physician, but the signature line for the nurse is blank. *See,* Exhibit A. There is no indication of a nursing assessment on the "Emergency Physician Record – Pediatric Injury" form, which is two-sided and was completed by NP Burlingame only. *See,* Exhibit A. The performance of a pre-discharge nursing assessment is similarly absent on the "Adult Head Injury Discharge Instructions"—the first page of which contains a signature by Linda Wadensten and Nurse May Lou Gallant, the latter of whom was acting, however, as a witness only. *See* Exhibit A. Finally, the foregoing record materials together with the "EDMS Encounter Events," which is a single-page print-out of the computer entries made by South County Hospital staff involved in the first visit of Maximus Wadensten to the Emergency Department, *see* Exhibit O, show that no nurse performed a post-triage nursing assessment as mandated by South County Hospital's EMTALA assessment policy. Indeed the only persons involved with Max on his first visit to the emergency department were: Keri Moran, R.N, the triage nurse; Susan Lassy, a non-medical staff person who obtained registration information; NP Pamela Burlingame, the sole medical provider involved in the Max's care after triage; and Mary Lou

Gallant, R.N., who was only involved to the extent of witnessing Linda Wadensten's signature on the discharge instructions.

Supporting the inference reasonably drawn from the medical records that the hospital deviated from its Assessment policy in screening Max in violation of EMTALA is the deposition testimony of Nurse Reid, who averred that she did not assess Max during his first visit to the emergency department. NP Burlingame's claims in her post-incident notes and answers to interrogatories that Nurse Reid assessed Max and was present in the treatment room for the majority of the time that NP Burlingame was in the room both before and during discharge. Not only are these claims clearly questionable when set against the positive testimony of Nurse Reid and the absence of supporting medical-record documentation, a disputed issue of material fact precluding summary judgment is evident from the summary judgment record.

The hospital's fundamental departures from the ED Assessment Policy demonstrated in the summary judgment record plainly support a finding that the hospital denied Max an appropriate screening in violation of EMTALA. *See, e.g., Cruz-Queipo,* 417 F. 3d at 70 (disparate treatment evidenced by departure from hospital standards in triage of patient with chest pains precluded summary judgment for hospital on EMTALA claims).

**B. The hospital deviated from prevailing emergency department screening standards – and violated EMTALA – when Maximus was screened for a skull fracture using manual palpation, a method that the summary judgment record demonstrates is neither standard nor relied upon as a screening tool at South County Hospital.**

Before NP Burlingame discharged Max, she considered it necessary to determine whether Max had a linear skull fracture, which she ruled out using manual palpation. NP Burlingame described her technique as follows:

A. When I felt through the bump on the back of the, you can actually feel the contours of the skull. It was soft enough to do that, so I felt there was no skull fracture.

Q. How can you -- how does feeling the back of the head indicate to you whether there is a skull fracture?

A. You can feel an irregularity in the surface of skull in the particular area where this bump was; should be smooth, and was.

* * * * *

Q. In other words, with this baby, you are feeling at site of the bump to see whether you could feel irregularity on the skull bones?

A. Yes.

Q. And you determined you felt you did not feel any, correct?

A. Yes.

Q. And based on that, you determined there was not a fracture?

A. Yes.

* * * * *

Q. But where did you learn it? Do you think you learned it in school?

A. Probably not. Probably learned it through my years of experience as an emergency room nurse where it is part of a nursing physical assessment as well.

Q. So you incorporated that into your medical evaluation?

A. Yes.

Q. As a means of ruling in or ruling out fracture?

A. Yes.

Dep. NP Burlingame, 5/20/05 at 146-48; Exhibit E.

In her Answer to Interrogatory No. 12, which asked for a description of all methods for diagnosing skull fracture, NP Burlingame similarly maintained:

> I discussed the patient's condition with Dr. Drury and no radiographic studies were ordered based on clinical examination and the history provided by the mother and the nanny. *X-ray were [sic] not taken because I was able to palpate the skull directly under the site of injury and did not find any evidence of depressed or linear skull fracture.*

NP Burlingame ATI; Exhibit B. Defendant Burlingame's own statements thus confirm that, with respect to ruling out skull fracture, palpation was not merely one part of her examination; it was the diagnostic tool she considered definitive, and upon which she relied.

The screening method described by NP Burlingame is not recognized by any physician or nurse practitioner who has testified in this matter, nor is it described in any text. To determine whether palpation was a standard method for diagnosing skull fracture at the hospital's emergency department, the Wadenstens propounded an interrogatory to the hospital which requested the identification of all pediatric patients for whom palpation *was* used to diagnose for skull fracture from January 2001 to date. *See,* Hospital ATI #17; submitted with Defendant's exhibits in support of its motion for summary judgment. Significantly, *in none of the nearly 500 instances referenced in the hospital's answer does it identify a single patient for whom skull fracture was diagnosed by manual palpation.* Indeed, in its final "Further More Responsive Answer" the hospital admits that "palpation is a *part* of the physical examination of patients that present with substantially similar symptoms/complaints as the minor plaintiff," which further confirms that palpation is not used by practitioners at South County Hospital as it was used by defendant Burlingame, that is, to diagnose or rule out skull fracture.

Corroborating the data collected by the defendant hospital, the chief of the hospital's emergency department, defendant Dr. Drury, testified that palpation for detecting skull fracture is not used or relied upon at the South County Hospital Emergency Department.

Q. Okay. So is it fair to say that it's your understanding, first of all, that this physician extender, Nurse Burlingame, knows how to perform appropriate evaluation for a patient with head injury? It's your belief that she does?

A. Yes.

Q. So you expect her to understand that for some it can be appropriate to do the evaluation and not keep the patient for, that that's appropriate for some, correct?

A. Yes.

Q. And you would expect her to understand that there other patients where -- there are other for whom the appropriate course is to for monitoring and re-evaluation, you would expect her to understand that?

A. Yes.

Q. And then you would expect her to understand that she -- if based upon the physical and history she felt it was appropriate or necessary rule out a skull fracture, then follow that and rule out a skull fracture?

A. Yes.

Q. Okay. And *you would expect her to understand once she decides she needs to rule out skull fracture, she needs to go on to imaging?*

MR. NUGENT: Objection.
MR. ELIAS: Objection.

A. *Yes.*

Q. Do you know whether Nurse Burlingame ever arrived at the conclusion that she did need rule out fracture? Do you know?

A. No. We didn't discuss that.

Q. Do you know whether Nurse Burlingame decided that she needed to rule out skull fracture and ruled it out by palpating the baby's head? Do you know that ever happened?

MR. NUGENT: Objection.

A. No.

Q. Do you consider that an appropriate method of ruling out skull fracture where the practitioner decides that skull fracture needs to be ruled out?

MR. NUGENT: Objection.
MR. ELIAS: Objection.

Q. Do you consider that to be appropriate?

MR. ELIAS: Objection.
MR. NUGENT: Objection.

DR. DRURY: *Do I consider palpation of head an appropriate method of ruling out skull fracture?*

MS. WEIZENBAUM: Right.

MR. NUGENT: Objection.

A. *Not that there are any x-rays at the tips of fingers, no.*

Q. Do you ever use that method to rule out skull fracture in a patient, again, with a head injury you've decided you need to rule out skull fracture? Do you ever use that method?

MR. NUGENT: Objection.

A. *Do I palpate the head? Yes. Do I use that to determine whether there's a skull fracture or not? No.*

Dep. Dr. Drury, 5-23-05 at 36-39 (emphasis added); Exhibit C. The testimony of Dr. Drury clearly supports a finding that the screening tool used at South County Hospital for ruling out skull fracture is radiographic imaging—not manual palpation. The summary judgment record referenced above further supports a finding that the hospital deviated from prevailing emergency department screening standards (thus violating EMTALA) when it failed to perform an imaging study to determine whether Maximus presented to the hospital with a fractured skull. *See, e.g., Cruz-Queipo*, 417 F. 3d at 71 (departure from hospital standards, which set the parameters for an appropriate screening, constitutes a denial of an appropriate screening examination in violation of EMTALA).

Plainly, the linchpin of the hospital's summary judgment claim—*i.e.,* that Max "underwent a similar process for medical screening undertaken on other patients who presented at the Hospital's emergency department with similar complaints," Def. Mem at 17, 22—is misconceived. As such, the Court ought to deny the hospital's motion for summary judgment on the Wadenstens' EMTALA claims.

**C. The hospital contravened policies that provide that patients who present as "urgent", as Maximus did at the first visit, must be managed by a medical provider with appropriate Category II privileges.**

It is undisputed that during the first, critical visit to the hospital's emergency department, Maximus was never seen by a physician—only by NP Burlingame. The summary judgment record supports a finding that this was utterly inconsistent with the hospital's policies and privileging system, and thus a violation of EMTALA. Indeed, the hospital's policies make clear that NP Burlingame did not have the necessary qualifications to perform a screening examination on an urgent patient who came to the hospital's emergency department in Max's condition.

Because Max was triaged as "urgent," hospital policies required his care to be managed by a physician with Category II privileges. *See inter alia* ED Physician Policy at 2, Exhibit L;

The summary judgment record reasonably supports a conclusion that none of the Category II privileges possessed by NP Burlingame in October 2003 permitted her to perform an appropriate medical screening examination on an urgent patient who came to the hospital's emergency department in Max's condition. Indeed, the record compels an entirely different finding: having completed only nursing school, and a three-year, part-time, nurse-practitioner program in Family Practice, NP Burlingame fell far short of possessing the credentials necessary to perform an appropriate medical screening examination on Max.

In 2003, the only Category II privileges grated to NP Burlingame were a narrow set of Category II procedures. In addition, she was permitted to provide other, specified, elements of care to Category II patients beyond those provided by a non-advance practice that appear on the "Specified Services for Nurse Practitioners." *See* Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; copies attached as Exhibit M. Some of those elements of patient care were required to be carried out under Direct Physician Supervision (DPS) and other required no direct supervision. With respect to neurologic examinations, the hospital restricted NP Burlingame to "performing and recording" them and specifically confined her ability to treat patients with "altered consciousness" to *initial* management or *initial* evaluation with *direct physician supervision. See, id.*

When the hospital deviated from its policies which required Max to be seen in the emergency department by a physician with Category II privileges and qualifications (which NP Burlingame did not possess), it plainly denied Max an appropriate screening examination in violation of EMTALA. *See, e.g., Cruz-Queipo,* 417 F. 3d at 71 (departure from hospital standards, which set the parameters for an appropriate screening, constitutes a denial of an appropriate screening examination in violation of EMTALA). As such, the Court ought to deny the hospital's motion for summary judgment.

## II. The hospital violated EMTALA by not providing an appropriate medical screening examination by a properly designated "qualified medical person," as required by EMTALA regulations.

In addition to requiring a hospital to "even-handedly administer an appropriate screening procedure to all emergency room patients," EMTALA regulations require that an "appropriate medical screening examination * * * *must be conducted by an individual(s) who is*

*determined qualified by hospital bylaws or rules and regulations.*" 42 C.F.R. §489.24(a)(1)(emphasis added).

The hospital's ED Transfer Policy makes clear the hospital's awareness of its obligation to comply with EMTALA regulations mandating that the hospital designate a "qualified person" in its by-laws or rules or regulations designated by the hospital to conduct appropriate medical screening examinations. *See,* ED Transfer Policy; Exhibit F. Notwithstanding, in October 2003, when Max presented to the hospital's emergency room, the hospital had not designated in its by-laws or rules and regulations those individuals who it determined were qualified to conduct appropriate medical screening examinations, as required by EMTALA regulations.[4]

The hospital's failure to explicitly designate qualified medical persons to perform medical screening in the emergency department as required by EMTALA regulations plainly endorsed an environment of ambiguity in which NP Burlingame herself was left to decide the scope of her qualifications and privileges and here, to the detriment of Max, permitted NP Burlingame to practice beyond them. Significantly, the hospital previously had allowed NP Burlingame to practice beyond the scope of her privileges, and been cited by the Department of Health. This is clearly the type of situation that the regulation requiring the

---

[4] Inclusion of the privileges of non-physician practitioners is also required by the Rhode Island *Rules and Regulations for Licensing of Hospitals. See*, Section 11 Medical Staff, § 11.4 "The medical staff, subject to the approval of the governing body of the hospital, <u>shall adopt by-laws incorporating</u> details of its general powers, duties, and responsibilities including … (f) delineation of clinical privileges of non-physician practitioners." In 2002 the hospital advised the Department of Health "the Medical Staff Leadership has made revisions to the Medical Staff Rules and Regulations with regard to the Registered Nurse Practitioner." *See,* SCH, Report to the Rhode Island Department, Exhibit P. As of 2005 the hospital had not done so.

hospital's governing body to formally designate those persons qualified to perform screening examinations was designed to prevent.

Plainly, the hospital violated EMTALA by not providing an appropriate medical screening examination by a properly designated "qualified medical person," as required by EMTALA regulations. As such, the hospital is clearly not entitled to summary judgment on the Wadenstens' EMTALA claims.

## III. The hospital's claim that it was not required to stabilize Max before discharge is without merit.

The hospital's claim that, as a matter of law, a patient cannot assert an EMTALA stabilization claim where the hospital fails to determine that the patient has an emergency medical condition is unfounded. Where a hospital has knowledge sufficient to indicate that a patient is suffering from an emergency medical condition, it has a duty to stabilize the patient and, as such, is not entitled to summary judgment on the patient's stabilization claim. *See, e.g., Cruz-Queipo*, 417 F. 3d at 71-72.

Here, for purposes of summary judgment, it must be accepted as true—as Linda Wadensten testified at deposition—that the hospital knew that Max was dozing during in the emergency room during his first visit on October 25, 2003. Even NP Burlingame acknowledged that this would have been an "unusual" sign which would have led her to re-assess Max. Dep. NP Burlingame 5/20/05 at 157-158. The record supports a finding that had this been done, the hospital would have perceived that Max had an emergency medical condition requiring stabilization. *See,* R. Barkin, M.D., Dep. at 66-74, 107-111; Exhibit N.

## CONCLUSION

For the foregoing reasons, the Court ought to deny the hospital's motion for summary judgment on plaintiff's EMTALA claims.

Plaintiffs,
By their Attorneys,

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax

# CERTIFICATION

I hereby certify that a true and accurate copy of the within was served on counsel of record listed below on this 25 day of April, 2006 by U.S. mail:

Jay Elias, Esq.
Paul Galamaga, Esq.
Ratcliffe, Burke, Harten & Elias, LLP
1600 Financial Plaza
Providence, RI 02903

Mark T. Nugent, Esq.
Paul V. Sullivan, Esq.
Morrison, Mahoney, LLP
121 South Main Street, Suite 600
Providence, RI 02903

Jennifer Houston