UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINDA WADENSTEN, Individually and p.p.a. MAXIMUS WADENSTEN<br>Plaintiffs, | : | |
| v. | : | C.A. No. 04-326S |
| SOUTH COUNTY HOSPITAL;<br>PAMELA BURLINGAME, RNP;<br>ROBERT J. CASCI, JR., D.O.;<br>TIMOTHY DRURY, M.D.<br>RHODE ISLAND EMERGENCY PHYSICIANS, INC.<br>Defendants. | : | |

**PLAINTIFF'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF MEMORANDUM IN OPPOSITION TO DEFENDANT SOUTH COUNTY HOSPITAL'S MOTION FOR SUMMARY JUDGMENT**

NOW COME plaintiffs Linda and Maximus Wadensten and pursuant to D.R.I. LR Cv 56(a)(4) submit the following statement of disputed and undisputed facts in support of their memorandum in opposition to South County Hospital's motion for summary judgment on plaintiffs' EMTALA claims.

**DISPUTED FACTS**

1. While not disputed, plaintiffs submit that ¶¶ 1, 3, 4, 6, 8, 9, 10, 11, 12, 13, 16, 17, 18, 21, 22, 46, and 50 of the hospital's statement of undisputed facts are immaterial to the consideration and resolution of the hospital's motion.

2. Plaintiffs dispute that part of ¶ 7 of the hospital's statement of undisputed facts which avers that NP Burlingame holds "privileges as a Registered Nurse Practitioner." There is no such category of privileges. The hospital granted NP Burlingame "Category I" ED physician privileges as set forth on a list of Specified Services for Nurse Practitioners,

designated procedures from the list of Category II privileges and various non-physician privileges also set forth on a list of Specified Services for Nurse Practitioners. *See,* Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; Exhibit M.[1]

3. Plaintiffs dispute the characterization in ¶¶ 16, 17, 18 of the hospital's statement of undisputed facts that Jennifer Weiss "admitted" dropping Max instinctually and other matters. Ms. Weiss described in her deposition testimony the manner in which Max fell and hit his head. She did not "admit" dropping Max instinctually. She did not "admit" (or even testify) that he fell first onto his "diapered" buttocks. She acknowledged, but did not "admit" that she was careless in Max's accidental fall.

4. Plaintiffs dispute that part of ¶ 20 of the hospital's statement of undisputed facts which avers that "Jennifer Weiss testified that, while in her presence, at no time did [Max] lose consciousness." In the cited deposition testimony (Dep. J Weiss, pt. 1, at 104), Ms. Weiss clearly states that Max did not lose consciousness from the time of the fall until, about 7 minutes later, she called Linda Wadensten.

5. Plaintiffs dispute that part of ¶ 24 of the hospital's statement of undisputed facts which characterizes "the reason for the visit" as "fall sustaining bump on the head." That was the complaint documented in the medical record. The reason for the visit was to have Max checked out by a doctor. *See,* Dep. L. Wadensten at 46-48.

6. Plaintiffs dispute that part of ¶ 27 of the hospital's statement of undisputed facts which states that NP Burlingame performed a "head-to-toe" physical examination of Max. Plaintiffs contend that NP Burlingame's examination was "minimal." *See, e.g.,* Dep. L. Wadensten at 14.

---

[1] The "Exhibits" referenced in the text are attached to plaintiffs' memorandum in opposition to defendant's motion for summary judgment.

7. Plaintiffs dispute that part of ¶ 30 & 31 of the hospital's statement of undisputed facts which states that NP Burlingame could perform the examination of Max without a physician present. While NP Burlingame may have thought so and so testified in her deposition, plaintiffs submit that the hospital's own policies and documents show that NP Burlingame was neither qualified nor permitted by the hospital to evaluate and discharge Max without a physician. *See,* Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; Exhibit M.

8. Plaintiffs dispute that part of ¶ 37 of the hospital's statement of undisputed facts which maintains that NP Burlingame reviewed a nurse's note when she examined Max. While the medical record contains a checked box to that effect, there is no nurse's note in the record, other than the information recorded by the triage nurse.

9. Plaintiffs dispute that part of ¶ 48 of the hospital's statement of undisputed facts which claims, in essence, that plaintiffs do not allege that Max received disparate treatment by the hospital. Plaintiffs' complaint (Count VII) plainly claims that the hospital violated EMTALA by failing to provide an appropriate screening examination.

10. Plaintiffs deny and dispute that Max "underwent a similar process for medical screening undertaken on other patients who presented at the Hospital's emergency department with similar complaints." Def. Mem at 17, 22.

11. Nurse Reid was not present during NP Burlingame's examination of Max and did not perform a nursing assessment of him. Dep. M. Reid, R.N., 7/28/05, at 80, copy (partial) attached as Exhibit J. *See also, id.* at 130-33.

## UNDISPUTED FACTS

1. The hospital failed to provide Max with critical nursing assessments, which, according to the hospital's own written "EMTALA" policy, are required for every emergency-department patient.

2. Max's became drowsy and dozed before being discharged.

3. Prevailing emergency department screening standards require an imaging study to diagnose or rule out a fractured skull.

4. Manual palpation of the head cannot diagnose or rule out a linear skull fracture.

5. Manual palpation of the skull is not used by medical providers at the hospital to diagnose or rule out linear skull fractures.

6. Max was appropriately triaged as "urgent" at reception and then seen by a nurse-practitioner, defendant Burlingame, for evaluation and treatment. *See,* ED Record; copy attached as Exhibit A.

7. The hospital's policies required Max's care to be managed by a physician with appropriate Category II privileges not a nurse-practitioner.

8. During the first, critical visit to the hospital's emergency department, Maximus was never seen by a physician.

9. The hospital did not designate NP Burlingame in its bylaws or rules and regulation as qualified to perform necessary and appropriate medical screening examinations.

10. The hospital did not designate NP Burlingame in its bylaws or rules and regulation as qualified to perform necessary and appropriate medical screening examinations for an infant, like Max, who presented with an intracranial injury with altered consciousness requiring neurological evaluation.

11. Max did not undergo a similar process for medical screening undertaken on other patients who presented at the Hospital's emergency department with similar complaints.

12. Younger patients who present to the hospital with minor head trauma do not receive palpation instead of a CT scan to rule out skull fracture.

13. NP Burlingame explained her decision not to order an imaging study in her answers to interrogatories: "X-ray [of the skull] was not taken because I was able to palpate the skull directly under the site of injury and did not find evidence of depressed or linear skull fracture." *See,* NP Burlingame ATI #12; copy (partial) attached as Exhibit B.

14. Dismissing palpation as an acceptable method of ruling our skull fracture, the hospital's physician responsible for supervising NP Burlingame—defendant Dr. Drury—testified at deposition that that method would only have worked with "x-ray fingers." *See,* Dr. Drury Dep. 5/23/06 at 39; copy (partial) attached as Exhibit C.

15. Notwithstanding the fact that Max exhibited signs of a change in mental status while in the emergency department—*i.e.*, he became drowsy and dozed—he was discharged without re-assessment or an imaging study. *See,* L. Wadensten Dep. 5/27/06 at 64-67; copy (partial) attached as Exhibit D.

16. Max was discharged without re-assessment or imaging study in spite of the fact that even NP Burlingame acknowledged that a change in Max's mental status before discharge would have compelled further assessment and imaging. *See,* NP Burlingame Dep. 5/20/06 at 157-58; Exhibit E.

17. Dr. Drury did not see Max before his discharge from the emergency department.

18. The Wadenstens claimed that the hospital's treatment and care of Max violated the Emergency Medical Treatment and Active Labor Act (EMTALA). Complaint, Count VII.

19. Before October 2003, the hospital's governing board had adopted a policy on "Transfer to Other Facilities," which, among other things, recognized the hospital's responsibility to comply with EMTALA and to implement its requirements, including the provision of "an appropriate medical screening examination within the capability of the Hospital's Emergency Department" and the adoption of "appropriate rules or by-laws to determine who is a qualified medical person to perform necessary and appropriate medical screening examinations and to ensure that such individuals meet the requirements of state and federal law, rules and regulations." *See,* Hospital (Transfer) Policy #540, copy attached as Exhibit F.

20. In addition to its Hospital Transfer Policy, the hospital's emergency department had in place other policies, protocols, practices, and standards intended to be applied "to even-handedly administer an appropriate screening procedure to all emergency room patients."

21. The hospital's emergency department had an "Assessment" policy and procedure in place in October 2003, which specifically references EMTALA. *See,* ED (Assessment) Policy #255, copy attached as Exhibit H.

22. The hospital's ED Assessment Policy states that its purpose "is to apply the same standards to "all Emergency Department patients" and to "ensure[] *parity of care* for *each patient* entering the Emergency Department." *Id.* (emphasis added).

23. The ED Assessment Policy requires the uniform assessment of all emergency department patients as follows:

> 1. All patients presenting to the Emergency Department will be assessed (triage assessment) by a registered nurse upon their arrival and assigned an acuity level.
>
> 2. All patients will receive a secondary assessment, and ongoing reassessment.

3. The ongoing nursing reassessment will be based upon the dynamic status of the patient and response to care.

4. All assessment and reassessment techniques will be sensitive to the patient's age-specific physical, developmental, cognitive, and psychosocial needs.

5. Each nurse will document significant patient data as appropriate to the nature and severity of the illness/injury.

6. Within 15 minutes prior to discharge, a nursing note will reflect the general condition of the patient as it relates to the triage chief compliant. Vital signs (TPR, BP, SaO2, Pain) will be repeated if abnormal.

*Id.*

24. The medical records show that Max did not receive a single post-triage nursing assessment. *See*, ED Record; Exhibit A.

25. The hospital has no bylaws or rules and regulations which specifically delineate qualified medical persons to perform necessary and appropriate medical screening examinations.

26. According to the hospital's policies and privileging system, NP Burlingame did not have the necessary qualifications to perform an appropriate medical screening examination on an urgent patient who came to the hospital's emergency department, including Max.

27. Patients who are assessed as "non-urgent"—*i.e.*, where "treatment is not a critical factor" and who "may be treated several hours after arrival—"[t]ypically may be seen in Express Care." *See*, ED (Triage) Policy #200 at 1, copy attached as Exhibit K.

28. Patients, like Max, who are assessed as "urgent"—*i.e.*, "a major illness or injury requiring treatment within 30 minutes (ideally)"—"should typically be seen in the main emergency room." *Id.*

29. The hospital's emergency department policies provide that, unless a patient requests to be treated by a family physician, "[a]ny patient who comes into the Emergency

Department for treatment will have * * * the Emergency Department physician * * * handle the problem." *See,* ED (Physician) Policy #170.

30. The ED Physician Policy separates emergency department physicians into two categories. "Category I" ED physicians are required to have two-years of post-graduate training and/or experience, including an approved internship in medicine, surgery, family medicine, or emergency medicine. *Id.* at 2.

31. "Physicians in Category I are only permitted to work in Express Care"—or, in other words, on patients assessed as "non-urgent" (*e.g,* ear ache, cold, urinary tract infection, back aches, minor nosebleeds, sore throat). *See,* ED Physician Policy at 2; ED Triage Policy at 2.

32. Physicians in "Category II" must have *three*-years of post-graduate training and/or experience including an approved internship in medicine, surgery, family medicine, or emergency medicine, and "formal training in intensive care." ED Physician Policy at 2.

33. A Category II emergency department physician is not restricted to treating non-urgent patients in Express Care, but "may work the full Emergency Department." *Id.*

34. As a nurse practitioner assigned to the emergency department, NP Burlingame's privileges were not granted in the same manner as an emergency department physician.

35. Nurse Burlingame's privileges to treat patients in the emergency department were granted consistent with the hospital's Definitions for Delineation of Clinical Privileges in the emergency department. *See,* Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; copies attached as Exhibit M.

36. Those definitions specify that "Privileges for a Nurse Practitioner/Physician Assistant *to perform certain procedures such as those listed above in the definition of Category 2* privileges may be granted on an individual basis" *See,* Definitions; Exhibit M.

37. The hospital granted NP Burlingame "Category I" privileges—*i.e.*, to treat patients assessed as "non-urgent"—and privileges to perform specific Category II procedures. *See*, Appointment Letter, Definitions, and Specified Services for Nurse Practitioners; Exhibit M.

38. None of the privileges to perform specific Category II procedures possessed by NP Burlingame when Max arrived at the emergency room in October 2003 permitted her to manage and discharge Max.

39. Pursuant to the hospital's ED Assessment Policy—which specifically references EMTALA—every patient coming to the emergency department for treatment must receive several assessments, including a triage assessment, an initial post-triage nursing assessment, an ongoing nursing assessment, and a pre-discharge nursing assessment.

Plaintiffs,
By their Attorneys,

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within was served on counsel of record listed below on this 25 day of April, 2006 by U.S. mail:

Jay Elias, Esq.
Paul Galamaga, Esq.
Ratcliffe, Burke, Harten & Elias, LLP
1600 Financial Plaza
Providence, RI 02903

Mark T. Nugent, Esq.
Paul V. Sullivan, Esq.
Morrison, Mahoney, LLP
121 South Main Street, Suite 600
Providence, RI 02903

/s/ Jennifer Houston